# CHARLESTON.

ELSIE Boos *v.* PETER Boos.

Submitted May 1, 1923.   Decided May 8, 1923.

1. DIVORCE—*Circuit Court Has Jurisdiction, Where Parties Resided Within the State for a Year or More, Notwithstanding Husbands Intention not to Become Permanent Resident.*

    Where the husband and wife have resided in this state for one year or more, the circuit court of the county in which they last cohabited together has jurisdiction of a suit for divorce instituted by the wife for causes arising either before or during their residence in this state, although the husband contends that he never intended to make this state his permanent place of abode. (p. 731).

2. SAME—*False Charge of Prostitution by Husband Constitutes Cruel Treatment, Entitling Wife to Divorce.*

    A charge of prostitution made by the husband against the wife falsely is equivalent to cruel treatment on his part and entitles the wife to a divorce from bed and board. (p. 732).

3. SAME—*Disposition, Where Appellate Court Reverses Decree Denying Wife Relief Stated.*

    Where this court reverses a decree denying a wife a divorce from bed and board and dismissing the bill, and awards to her the relief prayed for, entering such decree as the lower court should have entered, the custody of the minor

93 W. Va.

child also will be decreed as the circumstances of the parents and the benefit and welfare of the child may require; and the cause will be remanded for the award of alimony, if any, in such sum as the lower court may deem proper. (p. 735).

4. SAME—PARENT AND CHILD—*Father and Mother Living Together Have Equal Rights and Duties in Respect to Custody and Services of Minor Child; Equity May Award Either Parent Custody of Minor Child as Its Welfare Demands, and May Alter it With Changing Circumstances in Awarding Custody, Welfare of Child Controlling Factor.*

The father and mother of their minor child, if living together, have equal powers, rights and duties in respect to its custody, control, services and earnings; and where the parents have separated and suit for divorce has been instituted, a court of equity has inherent and statutory power to award to either the custody, care and maintenance of the child, as the welfare of the child demands; and may from time to time revise or alter its decree in that regard as the circumstances of the parents and the welfare of the child may dictate. The paramount and controlling factor is the welfare of the child. (p. 735).

Appeal from Circuit Court, Berkeley County.

Suit for divorce by Elsie Boos against Peter Boos. From a decree dismissing the bill and awarding custody of the infant child to defendant, plaintiff appeals.

*Reversed, and decree rendered for plaintiff, and cause remanded.*

*Allen B. Noll, C. N. Campbell* and *J. O. Henson* for appellant.

*A. C. McIntire,* for appellee.

LIVELY, JUDGE:

The decree of April 1, 1922, appealed from, denied plaintiff the relief prayed for in her bill, dismissed the bill, and awarded custody of the infant child, Margaret Boos, to defendant.

The bill, filed at June Rules, 1920, prays for a divorce from bed and board from defendant on the ground of cruel and inhuman treatment causing reasonable apprehension

of serious bodily hurt to plaintiff and because of a false charge of prostitution made against her by defendant; and as incidental to the suit she asks for alimony *pendente lite* and permanently and the custody of the infant child, Margaret, four years of age; and a restraining order against defendant from further prosecuting a writ of habeas corpus awarded him for the purpose of obtaining custody of the child. The answer filed at the September term, 1920, denies the material allegations of the bill and asks that the custody of the child be awarded to defendant. The cause was referred to a commissioner who took evidence and filed a report at the February term, 1922.

Plaintiff, while at a music school in Virginia, then being eighteen years of age, began corresponding with defendant who lived in Sheboygan, Wisconsin, as the result of a matrimonial advertisement. After an exchange of photographs and numerous letters, she visited defendant and his family in Wisconsin, and after a short courtship of a few weeks they were married. The husband was then 33 years old. It was an unhappy marriage. Defendant was poor, and she assisted in various ways to make a living. She worked in a store and in a restaurant when her health and condition permitted. Mutual dissentions arose. His business efforts were not successful and want was ever present. She charges that he forced her on one occasion to assist him in sawing wood which caused a miscarriage followed by serious illness. On another occasion he accused her indirectly of having illicit relations with other men while she was working in a factory. She accuses him during this period of residence in Wisconsin, of cursing her and calling her improper names. These accusations are denied by him. Within this time the child, Margaret Boos, was born. It is evident that the marriage relations became strained to such an extent that she contemplated leaving him. In 1918 the mother of the plaintiff, Mrs. Howard, visited them in Wisconsin. Plaintiff, by working in a munitions factory, obtained sufficient money to accompany her mother home to Martinsburg in this state, ostensibly on a visit, accompanied by the child. After a month or six weeks of rest she obtained work in a knitting mill at Martinsburg.

Letters of a friendly nature were interchanged between her and her husband, and it is evident that he expected her to return to Wisconsin. However, in the spring of 1919 he came to Martinsburg. He claims that it was never his intention to make his permanent residence in this state; that it was always his intention to return to Sheboygan. However, he shipped his furniture and household goods to Martinsburg, where they were stored with his mother-in-law, where he and his wife resided she continuing to work in the knitting mill. After some time he obtained employment. On a Sunday morning in October, 1919, he took the child out for a walk, as was his usual custom, boarded a westbound train and started for Wisconsin. He was overtaken in Ohio by the wife and her sister and brother-in-law, and the child was recovered by the aid of police authorities of Akron, and the mother returned with the child to Martinsburg. The husband proceeded to Wisconsin. Later he returned to Berkeley county and sued out a writ of habeas corpus for the possession of the child. Pending the hearing of the writ the judge admonished the parties that they should make an effort to continue the matrimonial relations on account of the welfare of the child. Defendant had been accorded the right to take depositions of witnesses in Wisconsin to show his fitness to have custody of the child. An effort was made at reconciliation, which appears to have been abortive. Defendant had then obtained work at different occupations, making from $80 to $125 per month, and remained in Martinsburg or its near vicinity. In May, 1920, he went to the home of his mother-in-law where his wife had resided with the child all this time, for the alleged purpose of obtaining some bed clothes which were in the attic. On this occasion he is charged with having accused his wife of prostitution, the details of which will hereinafter be set out. At the following June rules she filed this bill for divorce. Pending the suit he was required to pay suit money and $25 per month for the support of his wife and child. Becoming delinquent in payment of the temporary alimony a rule for contempt was awarded against him. He left the state, and the rule for contempt is yet pending.

Defendant says the decree should be affirmed because: (1) plaintiff being a married woman could not acquire a domicile different from that of her husband, which he avers was in Wisconsin, and therefore the court was without jurisdiction to entertain her bill; (2) plaintiff failed to prove such cruel and inhuman treatment as would entitle her to a divorce *a mensa et thoro.*

Did the court have jurisdiction? The bill avers that plaintiff has been for more than a year next preceding the institution of the suit a *bona fide resident* of Martinsburg, and that she and defendant last cohabited together in Berkeley county in this state. The proof shows that she came from Wisconsin to Martinsburg the latter part of December, 1918, with her mother and child, not having decided at that time whether she would return to Wisconsin. Defendant came to Martinsburg in May, 1919, where they resumed marital relations. While he says he never intended to make this state his place of permanent residence, he brought his household goods and furniture and stored them at the home of Mrs. Howard. In October of that year he left with the infant for Wisconsin with the result above set out, returning a short time thereafter for the purpose of obtaining the custody of the child by *habeas corpus,* and remained until after this suit had been instituted in June, 1920. The place where the parties live together as husband and wife is their matrimonial domicile. Our statute, sec. 7, chap. 64, Code, requires that the plaintiff must be an actual *bona fide* citizen of the state with residence in the state for at least one year prior to the institution of the suit. The word "residence" as used in divorce statutes is almost universally construed as equivalent to "domicile." *Cohen* v. *Cohen,* 26 Del. 361; *Harrison* v. *Harrison,* 117 Md. 117; *Hall* v. *Hall,* 25 Wis. 600; *People* v. *Plat·,* 50 Hun. (N. Y.) 454; *Andrews* v. *Andrews,* 176 Mass. 92; *State* v. *Davis,* 199 Mo. A. 439; *Bechtel* v. *Bechtel,* 101 Minn. 511; 12 L. R. A. (N. S.) 1100. "The domicile of a wife for the purpose of divorce is not necessarily that of the husband, but it is sufficient if she is a *bona fide* resident of the state where suit is brought, especially where she remains in the place where they last had

their domicile, but only where she separates from her husband for justifiable cause does she acquire a separate domicile." 2 *Schouler on Marriage and Divorce* (6th Ed.) sec. 1506. In the same section this author says: "Where a wife separates from her husband and goes to live with a relative with the intention of making it her home, she may in that county apply for a divorce, and this is her domicile for the purposes of jurisdiction. The act and intention of making this her home decide the matter;" citing *McLintock* v. *McLintock*, 147 Ky. 409; 144 S. W. 68; 39 L. R. A. (N. S.) 1127. We think that when defendant came to Martinsburg in May, 1919, and resumed marital relations with his wife, a matrimonial domicile was then established in this state and the subsequent residence of plaintiff at that place for the statutory period gave the court jurisdiction under our statute for causes arising before or after. Can a husband while residing in the state give cause for divorce, then leave his wife, and prevent her from asserting her right for divorce, unless she follows him to a place which he claims as his permanent residence? *Carty* v. *Carty*, 70 W. Va. 146.

Does the proof sustain the decree? The divorce is sought on the charge of cruel treatment. Unless that averment be sustained by the proof the decree refusing a divorce *a mensa* must be affirmed. If we affirm the decree in that regard that part of the decree which awards custody of the child to the father must be reversed under the decisions in *Lord* v. *Lord*, 80 W. Va. 548; 92 S. E. 749, and *Roush* v. *Roush*, 90 W. Va. 491; 111 S. E. 335, where it is held that in a suit for divorce wherein the relief prayed for is denied, there is no jurisdiction in the court to change the custody of the children of the parties thereto.

Is the gravamen of the bill, cruel treatment, sustained by the proof? This is the crucial question. There is evidence, mainly from the lips of plaintiff, in part substantiated by her mother, Mrs. Howard, that defendant abused his wife, threatened her with violence and called her vile names while they resided in Sheboygan, Wisconsin. Plaintiff says he compelled her to help him saw wood for domestic use while she was *enceinte* and when she was unable to work for that

reason, causing a miscarriage and serious illness, and that he refused to procure prompt medical attention for her while she was suffering from the miscarriage. This he flatly denies. On another occasion, while she was working in a factory in that town he overheard some men on a street corner make an impertinent and disgraceful remark about her, and became suspicious of her virtue, demanding with anger and abuse of her in the privacy of their home, that she "have the men pinched to clear her reputation," causing her mental anguish and nervous strain. He does not deny the incident, but puts it in a mild form, and says·that he only asked her to "clear her reputation" of the imputation against her which fell from the lips of a person whom he was unable to name. It is claimed, however,·by her counsel that whatever transpired between them of that character in Wisconsin was condoned by their subsequent cohabitation in Martinsburg from the spring of 1918 to October of that year. Condonation of acts of cruelty by the wife are generally treated as conditional on his subsequent good behavior, and will not weaken her right to relief; and if subsequently repeated they are revived as ground for divorce. *Deusenberry* v. *Deusenberry,* 82 W. Va. 135; 95 S. E. 665, and authorities there cited There are other instances detailed by him where he found fault with her because he saw. her walking on the streets of Martinsburg in the company of men, some of whom he did not know. The incidents detailed were of the most innocent character. It would be the extreme of meticulous complaint for a husband to criticise his wife for greeting or walking with her male acquaintances whom she chanced to casually meet upon the street. It would evince little conception of a trained, choice, or even common appreciation of the most simple and universal relations of life. None·of the witnesses charge her with any impropriety. The husband had made inquiry as to her conduct, and·has seemed solicitous to find something which would reflect on.her character for chastity, without results. He had inquired of constable Wolf if he had ever seen her with any men. The conduct of the husband and his evident suspicions and jealousies have an im-

portant bearing upon the main incident, "the attic incident" where he is charged with having stigmatized her as being a street whore, and threatened her with violence. They show his attitude of mind toward her and tend to corroborate plaintiff and her witnesses as to what occurred in the attic. As to that incident, the wife says that defendant came to her mother's home about 7:30 P. M. of May 19, 1920, and requested her to go with him to the attic for the purpose of getting some bed clothes which he had stored there. While in the attic he accused her of improper conduct with men, threatened her with violence and actually assaulted her, kept her there for more than two hours by force and against her will, and accused her of having received money from men improperly, and called her a whore; as a result of which she became nervous and debilitated and was unable to work at the knitting mill for several days thereafter. Corroborating her is the testimony of her sister and brother-in-law, Stewart Patterson, and her mother, Mrs. Howard. Patterson and his wife (the sister) heard the loud talking in the attic and went to near the door where they say they heard him call her a whore and threaten her with violence. They could not hear all that was said. Mrs. Howard came home about 9 o'clock and heard loud talking in plaintiff's room, to which plaintiff and defendant had then descended from the attic, and heard him calling her vile names, such as a "perfect whore" using the epithet several times. Mrs. Howard interfered and then defendant left the house. She says that her daughter was nervous and excited and was unable to work for several days following. Defendant admits being in the attic and that he was there with her for possibly two hours, but denies that he called her a whore or other opprobrious names. He does admit, however, that he began the conversation with her by saying "Well, I thought I had a truer wife than that;" referring to occasions when he had seen her walking on the street in company with other men. Mrs. Bertha French, a roomer at Mrs. Howard's home, says that her room was at the top of the stairway on the second floor and that plaintiff and her husband passed through her room on the way to the attic on the occasion referred to,

closing the attic door after them, and that she heard nothing of the conversation. She says she went out of the house, in about one-half hour afterwards and they were yet in the attic and she, of course, could not say what occurred after she left. Some of the witnesses say plaintiff's left arm was bruised after she came from the attic. It will be noted that there is a sharp difference between the evidence of defendant and the other witnesses of what occurred on this occasion. Three witnesses say they heard him call her vile names and threaten violence. She says he attacked her and accused her of improper relations with other men. It is true that these witnesses were closely related to plaintiff. But unless we conclude that they were deliberately lying, the charges seems to be substantiated by a clear preponderance of the evidence. His former actions, jealousies and insinuations tend to substantiate the truth of the charge.

We think plaintiff has established her right to a divorce from bed and board by a clear preponderance of the proof. We do not exculpate plaintiff from all blame. She may have induced some of the ill treatment. The decree will be reversed, and such decree entered here as should have been entered by the lower court, giving her a divorce from defendant from bed and board. *Couch* v. *Wartenberg*, 91 W. Va. 91.

What shall be done with the infant child, Margaret Boos, This is the question which has given us the most serious concern. Our statute provides that in decreeing either an absolute or limited divorce the court may take such order as it shall deem expedient for the care, custody and maintenance of the minor children. The welfare of the infant is the controlling consideration. We have come to the conclusion; after a careful consideration of the entire record, that the child's welfare will be best conserved for the present in the custody and care of her mother. At her age a mother's care and ministrations are almost indispensable. The mother's reputation for chastity and morality is unshaken. Her ability and energy will provide for its material wants. She has been carrying that burden. Under sec. 7, chap. 82, Code 1923, if the parents are living together, neither has the paramount right to the custody, control, services and earnings

of the child. Prior to the act of 1921, chap. 80, the father was generally accorded that right, under the law. • This record discloses that this father has refused to provide monies for its support and remains in contempt of the court's order designed for that purpose. Should conditions change, the court may, on petition, make such new order concerning the custody of the child as the circumstances of the parents and its welfare may dictate. The decree entered here will give the custody and care of the infant, Margaret Boos, to the mother. The decree of the lower court is reversed, a decree will be entered here as above indicated, and the cause remanded for the purpose of entering such decree for alimony as to the circuit court may seem proper and equity demand.

<em>Reversed, decree for plaintiff.</em>