STATE *ex rel.* REGINE DOMICO

*v.*

PETE DOMICO

(No. 12652)

Submitted January 15, 1970.    Decided February 17, 1970.

Dissenting Opinion March 16, 1970.

*W. E. Mohler,* for relator.

*Steptoe & Johnson, W. F. Wunschel, Frank C. Mascara,* for respondent.

BERRY, JUDGE:

This proceeding involves a petition for a writ of habeas corpus filed by the petitioner, Regine Domico, a citizen of West Germany, invoking the original jurisdiction of this Court and praying that a writ be granted requiring the respondent, Pete Domico, her former husband, to produce the bodies of Martina Elizabeth and Angela Maria Domico, children of the parties, before the Court and to award the custody of said infant children to the petitioner.

This proceeding was instituted in this Court on February 27, 1967, and a writ was granted requiring the respondent to produce the two children before the Court on April 25, 1967, at which time the parties appeared before the Court with the children and the case was continued at the request of the parties in order to take depositions, both in this country and Germany. It was not until some three years later at the January regular term of Court that the case was submitted for decision on briefs and oral argument of counsel.

The petitioner and the respondent were married in Germany on November 20, 1958, while the respondent was in the United States Army stationed in Nuremberg, Germany. The petitioner was eighteen years old and pregnant at the time of the marriage. The parties lived together in Germany for about seven years; however, in 1963 the respondent was ordered to Fort Hood, Texas, and the peti-

tioner later lived with him in Texas for five months in 1965 after coming to America with the children. Having received orders to report to Vietnam, the respondent retired from the Army in May, 1965, with the rank of first sergeant, after twenty-three years of service. He went soon thereafter with his wife and children to Germany, and the family lived there for a year and three months. He sought employment in Germany during this latter period. The respondent is about seventeen years older than the petitioner, and some difficulties arose between the parties after his retirement and his return to Germany. During the time the parties lived together, they apparently were affiliated with the Lutheran church in which they had been married. In 1966, as hereafter explained, respondent returned to America with the children and without his wife, after which he became affiliated with the Roman Catholic church, and the children are now attending a parochial school of that church.

The serious marital difficulties between the parties began in 1966, and there is some indication that they discussed both separation and divorce. The petitioner claims that the respondent agreed to give custody of the children to her, but the respondent denies that any such agreement was made.

The respondent testified that in the summer of 1966 he learned from his wife, her relatives, and her attorney that she intended to take legal action against him. He then consulted an attorney in Nuremberg who appeared to have been an American living in that area. The attorney advised him to leave the country and to take the children with him. On September 6, 1966, without the knowledge of the petitioner, he took Martina, who had been sick and was home in bed, and then went to Angela's school where he took her from her classroom. Early on that same day, he left Germany for the United States with the two children, Martina, born on October 5, 1962, and Angela, born on January 23, 1959. Upon arriving in this country, he returned to his father's home in Monongah, Marion County, West Virginia.

The petitioner, after learning that the respondent had taken the children from their home and from school, immediately filed proceedings on September 6, 1966, in the District Court of Nuremberg, Court of Guardianship, Germany, and obtained an order for custody of the two children, preliminary to a divorce proceeding which was later instituted on September 19, 1966, in the District Court of Nuremberg-Furth. The petitioner was granted the divorce from the respondent in said court on August 15, 1967. The final judgment of the District Court in Germany in the divorce proceedings was brief and concise and contained the statement, "* * * the fault lies with the accused." There was no mention of custody of the children in the divorce decree. However, there was a statement in connection with the decree, which would be considered an opinion or finding of facts in this country, reciting that certain witnesses testified under oath. The finding or opinion, states that the evidence showed that the accused had conducted himself in an immoral way toward the two small girls; that he had fondled them in an improper manner and used obscene motions with them at various times.

After the institution of the habeas corpus proceeding in this Court, depositions were taken from the petitioner and her brother in Charleston, West Virginia, in which she again testified about the suggestive and immoral conduct of the respondent toward the children. In addition she stated that he had acted improperly with her in front of the children, that he had engaged in improper sexual relations, and had used foul language in the presence of the children which they heard and repeated. Petitioner further testified in the depositions that the respondent had the reputation of being dishonest while he was in Germany and had been accused of stealing coins and stamps; that she had argued with people who had accused him of such actions and that she had settled and compromised certain matters to avoid prosecution. Also, she stated that after the respondent left Germany the "C.I.D."

officers came to their house and recovered some government property contained in a tool box.

The petitioner further testified that the respondent had threatened to shoot her and burn down their house while he was in the Army; that she was in fear of bodily harm for both herself and the children and that he was highly nervous and neurotic. These statements were confirmed by her brother, Dr. Helmut Mad, who is a medical doctor in Germany with specialized training in psychiatry, although his principal practice is as a surgeon. Dr. Mad stated that although he had not treated the respondent, he had observed him as a doctor would observe a patient, while talking with him and noticing his reactions.

Depositions were taken from four persons in Germany which supported the petitioner's contentions. These depositions were translated in narrative form and were, therefore, objected to in the brief filed in behalf of the respondent because of the form used and on the ground that no right to cross-examination was allowed. There is no indication that there was anyone present in behalf of the respondent to cross-examine the witnesses in Germany, and no objection was contained in the depositions indicating that they were not in proper form in accordance with German law.

The deposition of the respondent categorically denied all the accusations made by his wife and her witnesses against him. He stated that the petitioner often left the children in his custody, while they were living in Germany, when she attended various meetings and made trips to visit her sister in another city in Germany and that there was no indication, at any time, on these occasions, that she was apprehensive of his treatment of the children.

It further appears that the respondent had given $8,000 of his own money to his mother-in-law to buy the property in which they all lived in Nuremberg, and also that he had helped her pay off a loan, equivalent to several thousand dollars, in connection with the property, such

loan having been obtained for the purpose of making repairs to the building which had been bombed during World War II. He denied that he had ever stolen any coins or stamps but claimed he had paid for certain coins that he was interested in and had obtained while in Germany.

Depositions were taken from the parish priest in Monongah, from the nuns who taught school where the children attended, from a state policeman and a welfare worker, all of whom are well-acquainted with the respondent and the two children. Their testimony was to the effect that the respondent was of good moral character and that he was well-thought of in the community where he lived; that the children lived with him and his second wife in a comfortable home, which the respondent had built in Monongah at a cost of about $25,000; that the children were happy and getting along well in school, had become well-adjusted and were participating in extra curricular activities such as singing in the choir of the Catholic church, taking ballet lessons and belonging to the Girl Scouts. They further testified that the respondent's second wife treated the two children with loving care, the same as if they were her own. It is contended that the advantages afforded the children in this country are superior to those that would be afforded to them in Germany.

There was uncontradicted testimony in behalf of the respondent, such testimony being that after returning to this country with the children, and before the divorce, the defendant requested that the petitioner come to this country and live with him and their children in a home which he was providing for them but that she had refused to do so.

The petitioner is employed as a secretary in Nuremberg and receives a salary of about $187 per month in American money. She is a high school graduate and attended one year of schooling in what would be comparable to a commercial college in this country. The respondent attended one year of high school and is employed as a blacksmith

in connection with the coal mine in Monongah and makes about $500 a month in this work. He also receives about $300 retirement pay from the Army, making his income more than $800 a month.

The respondent did not appear in the German divorce proceedings but admits that he knew about it by virtue of being served with a notice which would be equivalent to an order of publication.

After the petitioner obtained the divorce, the respondent instituted proceedings in the Roman Catholic church and had the marriage annulled. After this had taken place, he married Loretta Bienkoski on October 30, 1968, in Clarksburg, West Virginia, because they had been advised of unfavorable reactions to such marriage if it were performed in Monongah. The present Mrs. Domico was twenty-eight years old at the time of the marriage and had previously borne illegitimate twins. At the time the evidence was taken, Mrs. Domico was again pregnant. This would make a total of five children who would be living with the respondent and his present wife in their home in Monongah. The evidence, however, indicates that the new home, containing four bedrooms and two bathrooms, is entirely adequate for the comfortable living of the respondent, his wife and the children.

The only issue in this proceeding is who shall have custody of the children, Martina and Angela. It is the contention of the petitioner that this Court should recognize the judgments of the courts of Germany with regard to the status and custody of the infant children. It appears from the evidence that the respondent had left Germany with the children before the Court of Guardianship in Nuremberg, Germany, entered the order giving custody of the children to the petitioner. In such case it appears that there may be some question whether the German court had jurisdiction to award custody of the children. See 24 Am. Jur. 2d, Divorce and Separation, Section 774 and 27B C.J.S., Divorce, Section 392. The petitioner refused to agree to a reconciliation and live with the respondent in this country. It is a well-known principle

of law that a wife's domicile follows the husband and the husband has the right to fix the domicile. *Brinkley* v. *Brinkley*, 147 W. Va. 557, 129 S. E.2d 436; *Hartman* v. *Hartman*, 132 W. Va. 728, 53 S. E.2d 407. However, in any event, the order of the German court with regard to the custody of the children does not bar the courts in this state from making a later order or decree with respect to the custody of the children. *Cantrell* v. *Cantrell*, 143 W. Va. 826, 106 S. E.2d 768; *Pugh* v. *Pugh*, 133 W. Va. 501, 56 S. E.2d 901; *Suter* v. *Suter*, 128 W. Va. 511, 37 S. E.2d 474; *Stapler* v. *Leamons*, 101 W. Va. 235, 132 S. E. 507. The law covering the matter in the case at bar is succinctly stated in the syllabus of the *Stapler* case in the following language: "A foreign decree or order awarding the custody of a minor child in a divorce suit is not *res judicata* in a subsequent proceeding in this State, involving the custody of the infant, where there has been such change in the conditions since the rendition of the foreign judgment as to render its modification desirable for the welfare and protection of the child."

Full faith and credit under the Constitution of the United States is not required to be given to judgments of foreign countries; however, such judgments are frequently recognized and given force and effect through comity. 15A C.J.S., Conflict of Laws, Section 3(3); 27B C.J.S., Divorce, Section 329, 24 Am. Jur. 2d, Divorce, Section 964. In custody cases full faith and credit with regard to custody decrees of any sister state in this country is not required in a custody proceeding in another state. *Suter* v. *Suter, supra; Stapler* v. *Leamons, supra; Pugh* v. *Pugh, supra;* and *Cantrell* v. *Cantrell, supra.* The reason for this principle of law is that the welfare of the child is the polar star in such cases; and the only issue for determination in habeas corpus proceedings involving the rights of the parents to the custody of their children is the welfare and best interests of the children in connection with awarding of proper custody. *State ex rel. Lipscomb* v. *Joplin*, 131 W. Va. 302, 47 S. E.2d 221; *Pugh* v. *Pugh, supra.* This is true with regard to awarding of

custody of children in this country where former decrees with regard to custody are involved and is doubly true of decrees of courts of foreign countries under comity. The respondent and the children in this instant case are citizens of this country and comity will never be extended in any case which might injuriously affect our own citizens. *Stevens* v. *Brown,* 20 W. Va. 450.

The case of *Pugh* v. *Pugh, supra,* is quite similar to the case at bar. In that case the husband obtained custody of the children from the wife and brought them to West Virginia from another state. The wife brought a habeas corpus proceeding in this state and it was held that, although the manner in which the husband obtained the custody was not commendable, the action in that respect did not transcend or exceed his right as a parent to the possession of his children. However, his right to the custody of the children was subject to judicial determination in the event of a contest between him and the mother of the children. To entitle the petitioner to the custody of the children, it is incumbent upon her, in such proceeding, to show that a change of the existing custody of the children by the respondent would materially promote the welfare of the children. This principle is set out in the case of *Cantrell* v. *Cantrell, supra,* wherein it is stated that, "It is clear that whatever may be the rule adopted, a foreign decree or order is not a bar to a subsequent proceeding looking to its modification because of altered conditions *since the time of its rendition,* and where such altered conditions make a modification desirable and for the better welfare of the child." The *Cantrell* case also states that, in cases such as the case at bar, since a foreign custody decree is usually regarded as controlling as to conditions as they existed at the time the foreign decree was rendered, only matters that have occurred subsequent to the foreign custody decree can be litigated in the new decision. Therefore, upon a habeas corpus hearing in a custody case, the Court should disregard the voluminous allegations of misconduct and unfitness of either of the parents prior to rendition of the

previous custody decree, and should limit the present inquiry to relevant facts and circumstances which may be shown to have occurred since that time affecting the welfare of the children, and which may or may not justify a change in their custody. In any event, evidence of misconduct prior to any custody hearing may be admitted only as it tends to show present unfitness. 24 Am. Jur. 2d, Divorce and Separation, Section 823.

It appears from the evidence in this case that the children of the parties are well cared for by the respondent in an adequate home in Monongah, West Virginia; that the children are well-clothed and well-fed and healthy; that they are completely adjusted to life in this country and that it would be detrimental to their welfare to change the custody of these children at the present time. There is no evidence that the children would be benefited by removing them from the custody of the respondent in Monongah, West Virginia, and returning them to Germany under the custody of the petitioner. It is true that it appears they would be adequately cared for in Germany but not as well as they would be in this country. The petitioner owns no property in Germany, and the house in which she lives is owned by her mother. She is not as well off financially as the respondent, since his income is four or five times more than her income and he owns the home in which they live, free of encumberances. To remove the children from one country to another, to change their religion, and to subject them to different customs in this formative period of their lives would appear, from the evidence in this case, to weigh against their welfare and best interest. For the reasons stated herein, the change of custody prayed for by the petitioner is denied.

*Change of custody*
*prayed for denied.*

CALHOUN, JUDGE, dissenting:

Respectfully, I dissent from the Court's decision in this case. In order to emphasize the fact that I dissent respectfully and with deference to opposing views honestly

and sincerely entertained by other members of the Court, I deem it proper to make some statements as preface to my effort to state the basis of my dissent.

A dissent of a single member of the Court must necessarily be stated in the first person singular. Never before have I been so distressed by a decision of this Court. Never before, while a member of the Court, have I been so firmly convinced of a basis of and a need for an expression of dissent. My only regret arises from a recognition of the limitation of my capacity to state the dissent as I feel it should be stated. I shall, nevertheless, undertake to express my dissent respectfully, but as vigorously and as forcefully as my capacity will permit.

In undertaking to state the disagreement I feel so keenly, I want to emphasize, as forcefully as I can, that I make no claim to greater judicial ability or to greater sensitivity to the natural feelings of a loving mother and of her young daughters than that which I accord to in the other members of the Court.

The Court, in a justifiable effort to demonstrate the soundness of its decision, has placed the Catholic Church and the Lutheran Church in juxtaposition, to emphasize a difference rather than to make reference to similarity. In this background, I shall make some references to the two religious denominations and to the Holy Bible upon which, I apprehend, both church denominations have their foundations.

I believe that the Court has misconstrued the contention made by counsel for the relator in reference to the question of comity to be applied to the judgment of a court in West Germany and in this respect has misconceived pertinent legal principles which should be applied in this case. I believe that the Court, in refusing to restore custody of the children to the mother, has done great violence to basic equitable considerations and has disregarded numerous of its prior decisions which have firmly established certain legal principles which the Court should have applied in deciding this case.

In a decision of this case, we should commence, as does the Holy Bible: "In the beginning * * *." We should approach a decision of the case, not February, 1970, at Monongah, West Virginia, but rather, almost three and one-half years before, at Nuremberg, West Germany, when, on September 6, 1966, the two daughters, then four and seven years of age, respectively, were secreted and stolen by the respondent, one from school and the other from a sick bed. We should start at that time and place when the respondent, acting with the cunning of a fox and the stealth of a thief in the night, surreptitiously and fraudulently stole the young daughters from the custody, care and control of a loving mother, with a callous disregard of the natural feelings of the mother and young daughters which is inconceivable and incomprehensible as an act of a normal husband and father. We should return to that time and place where the respondent, knowing that divorce proceedings were in contemplation, fraudulently deprived German courts of a jurisdiction to make a lawful award of custody where that adjudication could best have been made and where the interests of the mother and young daughters could best have been protected.

I regard the acts of the respondent as highly reprehensible; as a shocking display of insensitivity to the feelings of the mother and young daughters; as a fraudulent and successful scheme to deprive West German courts of jurisdiction; as a fraudulent scheme which would, and ultimately did, require the mother to traverse a vast ocean, at great inconvenience and enormous financial burden, to seek, in a court in a strange country among strange people, a rectification of the consequences of the callous, shameful, reprehensible and fraudulent wrong so ingenuously conceived by the respondent in West Germany with the helpful advice of a lawyer who obviously was thinking primarily of the ultimate end result and only incidentally of the means of carrying out the nefarious scheme.

If ever a litigant came into a court with unclean hands to seek equitable relief, it was this respondent. The ingenious, reprehensible scheme conceived and commenced in West Germany has, by this Court's decision, culminated in full fruition and success.

The Court has treated this as a "change of custody" case. On the contrary, I believe the Court should have treated it as a "restoration of custody" case. Otherwise, the Court condones and places its stamp of approval upon the reprehensible, callous, selfish scheme conceived by the respondent and so reprehensibly carried out. I recognize that a husband and wife, while living together, have equal rights to the custody of their child or children. *Boos* v. *Boos,* 93 W. Va. 727, pt. 4 syl., 117 S. E. 616. Nevertheless, the father had no right whatsoever to make himself the exclusive custodian of the daughters by the course of action he pursued in this case.

This is unlike many cases we have previously decided, including those listed in *Whiteman* v. *Robinson,* 145 W. Va. 685, 691-92, 116 S. E.2d 691, 695, in each of which the mother, by agreement or otherwise, voluntarily surrendered custody of her child to another. This is the very antithesis of such a situation. In logic, reason, equity and right, therefore, we should not impose upon the mother the burden of establishing that a "change of custody" would promote the best interests of her daughters. No valid award of custody has been made heretofore. On the contrary, an onerous burden should be imposed upon the respondent to show why there should not be restored to the mother the custody of which she was deprived by the respondent's surreptitious, heartless and fraudulent conduct.

An aspect of this case which is most significant and which, by reason of the Court's decision, is enigmatic is the fact that there is not one shred of evidence in the entire record tending to show that the mother is in any sense unfit to resume custody of her daughters. All the proof is to the contrary. The husband does not undertake to prove her unfitness.

We were privileged to see the relator with her brother, the physician, in open court on the return day of the rule. Her deposition taken in this country discloses a high degree of intelligence and a fluent knowledge and command of the English language. In her deposition, she testified that her sister was at that time studying medicine with the purpose of becoming a medical doctor. I gained a most favorable impression of her brother and of her by seeing them in person in court and by reading their depositions taken in this country.

When the mother was in our Court seeking to regain custody of her daughters, there came to my mind so forcefully a portion of the first chapter of Deuteronomy which has been so prominently referred to by the bench and bar of this nation and so proudly applied to our judicial system:

> "And I charged your judges at that time, saying, Hear the causes between your brethren, and judge righteously between every man and his brother, and *the stranger* that is with him.
>
> "Ye shall not respect persons in judgment; but ye shall hear the small as well as the great; ye shall not be afraid of the face of man; for the judgment is God's: and the cause that is too hard for you, bring it unto me, and I will hear it."
> (Italics supplied.)

The opinion asserts that the respondent and the children "are citizens of this country". This is perhaps true in a technical sense in relation to the children; but it is true, nevertheless, that the only home and residence they ever had, before they were stolen, was in West Germany. I am not asserting that we should decide the case in favor of the mother merely because she is a "stranger" or a citizen of a foreign nation, though a friendly nation. I do earnestly assert, however, that if she had a right to expect a hospitable place anywhere in our entire nation, it was in this Court, where, at such a sacrifice and in such a heartening demonstration of a mother's boundless love, she had come to seek to regain the custody of her young daughters. I am quite willing to assert that we

should have been disposed to "lean over backward" in order to demonstrate unmistakably that the mother was not placed at a disadvantage merely because she was a "stranger" in a foreign land and because, on the other hand, the respondent is a "citizen" of this country. I believe our fervent purpose should be to do that which we rightfully would have expected of a West German court if the present situation were entirely reversed.

The majority opinion states: "To remove the children from one country to another, *to change their religion,* and to subject them to different customs in this formative period of their lives would appear, from the evidence in this case, to weigh against their welfare and best interest." (Italics supplied.) Must we overlook the fact that it was the father who wrongfully and stealthily created a shameful situation described in the language quoted immediately above?

If it is wrong "to change their religion", we should bear in mind that the respondent has already committed that wrong by unilaterally removing the young children from the religious denomination in which the parents were married and in which the children were being nurtured with the apparent acquiescence and approval of both parents. The Court indulges in an assumption that the mother would return them to the Lutheran Church if custody were restored to her. Possibly so. We do not know. But if so, this would not, in my opinion, "change their religion" in any substantial sense. True, it would constitute a change of religious denomination. But whether in the Catholic Church or in the Lutheran Church, the children will be taught religiously to observe Easter and Christmas. In either church, they will continue to be instructed to observe the teachings and example of the Son of Galilee who displayed and expressed a peculiar love for "little children", who rebuked adults for being insensitive to their acts and feelings and who said "of such is the kingdom of God." These children will continue to be taught, in either of the two religious denominations, of the same man who repeatedly spoke

of the fallacy of placing a disproportionate emphasis upon possession of wealth in terms of money or material things.

In reference to wealth in material things, the majority opinion states in relation to the mother. "She is not as well off financially as the respondent, since his income is four or five times more than her income and he owns the home in which they live, free of encumbrances." To that flimsy assertion, there are innumerable answers. The record contains a photograph of the home in which the mother lives in West Germany. In appearance, it seems considerably above the standard of the average American dwelling.

In her deposition taken in this country, the mother testified that her income had a much greater purchasing power than an equivalent amount of money in this country. Her income, if she were granted custody of the children, would be used only for three persons, whereas the husband's income must be used to maintain his large dwelling and to support the seven persons living therein, including two children who are unrelated by blood to these two little girls or to either of their parents. The Court, in the majority opinion, fails to take note of the fact that the respondent's moral and legal obligation to support his children would remain undiminished even if they were placed in the custody of the mother. It may be that difficulty would be encountered in an effort to enforce compliance with the legal obligation; but, if he has in his heart the interest in the children he professes to have, he would voluntarily contribute to the support of the children while in the custody of their mother; and the fine people of his church at Monongah would be the first to impress upon him the force of this moral obligation.

The first point of the syllabus of the majority opinion is misleading and wholly inapposite to the extent that it states that a "foreign decree or order" awarding custody is not res judicata where there has been a change of circumstances of such character as to render desirable a modification of the decree in order to promote the welfare

of the child. The "foreign decree or order" in the *Stapler* case was entered in a divorce suit in Texas, rather than in a foreign country. In the instant case, there has been no previous valid award of custody. This Court is making an initial award of custody.

The thrust of the argument of counsel for the relator in this case, I believe, is that the divorce awarded in a West German court is valid on the basis of comity. I recognize fully, as obviously does counsel for the relator, that an award of custody of infant children is never res judicata in the sense that it may not be modified or changed subsequently upon a showing of altered circumstances. This is true where the previous award of custody was made in the same court, in a court of a sister state, or a court of a foreign country.

It is my opinion that, even if it is assumed that a court in West Germany undertook to make a valid award of custody, that attempted award of custody is void for lack of jurisdiction. The children were not then in West Germany, and the West German court had no in personam jurisdiction of the respondent who had custody of the children at Monongah in this state.

My position, and the contention of counsel for the respondent as I understand his brief and oral argument, is not that a West German court had the power and jurisdiction to make a valid award of custody, but rather that the West German court did have in rem jurisdiction to grant a legally valid divorce.

The defendant in the divorce case in West Germany, the respondent in this case, had proper actual notice in relation to the divorce proceeding. This is recognized in the majority opinion. His attorney in Germany knew of the pendency of the divorce proceeding, but the respondent elected not to enter a personal appearance in the proceeding, either by action of his counsel or otherwise. Obviously he elected to rely upon the security of his position in having the children in his custody in this state.

I believe the validity of the divorce, based on in rem jurisdiction, should be recognized by this Court on the

principles of comity applicable to such a situation. See 24 Am. Jur. 2d, Divorce and Separation, Section 967, page 1103. The respondent does not deny the validity of the divorce granted by the West German court. In fact, he has recognized it by his remarriage on October 30, 1968. This Court is bound by principles of comity, I believe, to recognize the full validity of the West German divorce. Furthermore, he is bound to recognize its validity and is estopped to deny its validity because otherwise he is a bigamist and a felon under the laws of this state.

The respondent would apparently like to accept that part of the judgment of the West German court which granted the divorce and escape the portion of that judgment which found that "the fault lies with the accused." Additionally, the judgment order states in detail the court's findings of the most abhorrent sort of immoral conduct of the respondent in fingering the genitals of his very young daughters, kissing them "in an obtrusive manner", and lying upon one of the daughters in bed. One sentence from the rather extensive judgment order of the West German court contains the following specific finding: "The ascertained behavior of the accused was apt to endanger considerably the moral welfare of the children."

Irrespective of the specific findings of fact in the judgment order, implicit in the award of the divorce to the wife is the finding that the husband was the party at fault. The respondent seeks to take full advantage of the mere fact of a divorce and to ask this Court to disregard all portions of the judgment of divorce which are unfavorable to him. The findings of fact made by the court in West Germany as a part of its judgment of divorce were substantially the same as the testimony of the mother taken in this state.

"When a husband and a wife are divorced because of the marital misconduct of one of them the law generally favors the award of custody of the children to the innocent spouse." *Rohrbaugh v. Rohrbaugh*, 136 W. Va. 708, pt. 5 syl., 68 S. E.2d 361, and numerous prior decisions of

this Court to the same effect therein cited. To the same effect, see 27B ·C.J.S., Divorce, Section 309 (6) b, page 468.

"Ordinarily, where the child will be equally well cared for by either parent, the mother, in preference to the father, if the child be of tender years, is entitled to its custody." *Beaumont* v. *Beaumont,* 106 W. Va. 622, 146 S. E. 618. To the same effect, see *Settle* v. *Settle,* 117 W. Va. 476, 480, pt. 2 syl., 185 S. E. 859, 861; *Hughes* v. *Hughes,* 113 W. Va. 698, 700, 169 S. E. 403, 404; *Rierson* v. *Rierson,* 107 W. Va. 321, 323, 148 S. E. 203, 204. The rule favoring the mother is applied with peculiar force where the children are girls of tender years. *Campbell* v. *Campbell,* 203 Va. 61, 122 S. E.2d 658. This general rule was stated by Judge Maxwell, speaking for a unanimous Court, in *Reynolds* v. *Reynolds,* 109 W. Va. 513, 514, 155 S. E. 652, 653, as follows: "The evidence adduced by the relator in no wise convinces us that this mother is unfit to be further entrusted with her Godgiven responsibility of looking after the welfare of her child. When a court exercises its great authority in taking from a mother her child of tender years, *particularly a female child,* such course is justifiable *only where the most cogent reasons exist.* And, recognizing that in a normal mother, such as we believe this one to be, the deepseated impulse to care properly for her young child is the controlling thought of her life, the mantle of charity should be thrown around her to the end that mistakes may be forgotten and the good may be emphasized. Since none are without fault, charity should prevail." (Italics supplied.) The position of the mother in the present case is much stronger than that of the mother involved in the *Reynolds* decision because in that case, at the time of the custody hearing, the son was twelve and the daughter six years of age and particularly because, in the present case, no evidence whatsoever tends to show any degree of unfitness of the mother to have the custody, care and control of her young daughters.

The testimony establishes the basis of the following statement in the majority opinion: "* * * he married Loretta Bienkoski on October 30, 1968, in Clarksburg,

West Virginia, *because they had been advised of unfavorable reactions to such marriage if it were performed in Monongah."* (Italics supplied.) It is quite understandable that "unfavorable reactions" would arise among residents of Monongah, particularly among parents and other sensitive people, including members of the respondent's church, because of the prospect of the establishment of a home for these little sisters to be presided over by the mother of the illegitimate twin children, twins being wholly unrelated by blood to these two little sisters or to either of their parents. That mother at Monongah now must spread her love, care and attention, as best she can, among five young children, including the one recently born to the new marriage.

The Court has adjudged, on a basis wholly inconceivable to me, that the welfare of these little sisters will be best promoted in the crowded household at Monongah, thousands of miles from the comfortable home of the mother who has, in this case and in this Court, so impressively demonstrated her boundless love for her only children.

I would grant the prayer of the petition and award the custody of these little sisters to their loving, heartbroken natural mother who must be puzzled by the manner of administering justice in courts in the United States.