83 N.J. Super. 303 (1964)
199 A.2d 662
IN THE MATTER OF THE ESTATE OF JOSEPH ALEXANDRAVICUS, DECEASED.
JONAS BUDRYS, CONSUL GENERAL OF THE REPUBLIC OF LITHUANIA AT NEW YORK, PLAINTIFF-APPELLANT,
v.
JESSE MOSKOWITZ, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 26, 1963.
Decided April 17, 1964.
*305 Before Judges GAULKIN, FOLEY and LEWIS.
Mr. Abraham J. Slurzberg argued the cause for appellant.
Mr. Jesse Moskowitz, respondent, argued the cause pro se.
*306 The opinion of the court was delivered by LEWIS, J.A.D.
This is one of several appellate reviews incident to the estate of Joseph Alexandravicus, deceased. Death occurred February 15, 1953, and the litigated issue as to the right to administer decedent's estate is still a matter of controversy.
The detailed and historic facts portrayed in the judicial opinions previously reported need not be here recited. See In re Estate of Alexandravicus, 35 N.J. 230 (1961), and Aleksandravicius v. Moskowitz (action by attorney-in-fact for heirs with respect to sale of real estate), 76 N.J. Super. 470 (App. Div. 1962).
Subsequent to the afore-mentioned Supreme Court decision (decided June 20, 1961), Jonas Budrys, Consul General of the Republic of Lithuania, instituted proceedings in the Hudson County Court, Probate Division, demanding that he be granted letters of administration. The crucial allegations set forth in his verified complaint may be summarized:
 Joseph Alexandravicus of the County of Hudson died intestate leaving him surviving two brothers, Vincas and Antanas, residents of the Republic of Lithuania.
 Said Republic was unlawfully subjugated on June 15, 1940 and, shortly thereafter, it was illegally annexed into the Union of Soviet Socialist Republics. The occupied government is not recognized by the United States of America.
 Plaintiff's consular status with the Republic of Lithuania is evidenced by an exequatur issued to him by the Government of the United States. Pursuant to the "laws and treaties" of our country and the Republic of Lithuania, he, as consul general, has the power and authority to act as attorney-in-fact for his nationals who inherit American property in the State of New Jersey.
 The application of Jesse Moskowitz, Esq., for such an appointment was predicated upon a power of attorney (dated February 19, 1959), executed by decedent's two brothers empowering the New York law firm of Messrs. Wolf, Popper, Ross, Wolf & Jones, or its nominee, to apply for letters of *307 administration. Said power was not executed before officials of the Republic of Lithuania and was drafted in both the Russian and English languages which neither of decedent's brothers understood. It "was not explained to them before they executed the document and * * * their signatures were obtained under duress by officials of the said illegal and unrecognized occupational authorities," and the instrument should, therefore, be adjudged void.
Upon being served with a copy of the pleading and order to show cause returnable December 15, 1961, Moskowitz moved before the Supreme Court for a judicial directive under its prior decision. On January 15, 1962 that court ordered the issuance of a special mandate providing, inter alia, that letters of administration be issued to Moskowitz upon filing the required bond and that there be a "prompt disposition of the complaint of Budrys upon oral testimony with restraint in the meantime against the disposition of funds by Moskowitz." After a full hearing before the County Court, the trial judge entered an order on August 3, 1962 vacating the order to show cause and dismissing the complaint.
On appeal to this court plaintiff advances two major arguments to support a reversal: (1) the power of attorney and designation under which the authority of Moskowitz emanates is invalid; and (2) the consul general has the exclusive right to be appointed administrator.
Preliminarily, we shall dispose of defendant's overriding defense that the basic issues raised by Budrys in his complaint, and here on appeal, have already been determined by our Supreme Court and that plaintiff, in effect, is relitigating questions which are res judicata. We do not agree with that contention. The consul general was not a party to either the prior litigation on appeal before the Supreme Court or the subsequent proceedings wherein a petition for rehearing was denied. His presence during oral argument on appeal did not afford to him any legal status in the proceedings. While the court, upon the record then before it, concluded that Moskowitz should be appointed as administrator of the *308 estate, it did not foreclose the right of an interested party to challenge the legality of the documents underlying the appointment. There was an express direction that the order appointing him contain a provision as in In re Watson, 35 N.J. 402, 410 (1961), for leave "to all interested persons to apply for the designation of a different administrator or such other relief as may be appropriate." Any doubt as to the court's intention or meaning in that respect was explicitly resolved by its aforesaid special mandate directing the trial court to proceed with the disposition of the cause of action initiated by plaintiff.
We turn now to the merits of plaintiff's arguments.

AS TO THE POWER OF ATTORNEY
The voluntariness of the power of attorney and the legality of the notarial acts appended thereto are questioned. Aside from an interpreter who was produced to identify the foreign language instruments, two witnesses testified for the plaintiff. They were Joseph Alexandravicius, of Harrison, New Jersey, a cousin of the decedent, and one Anicetas Simutis, a vice-consul associated with the New York office of the Consul General of the Republic of Lithuania, appearing for Budrys who was recuperating from a heart attack.
Joseph's testimony was that he formerly lived in Lithuania and left that country in 1913 to take up permanent residence in the United States. He knew decedent's two brothers Vincas and Antanas and, in fact, prior to his immigration to this country, they had all lived in the Village of Miknishkiai, County of Lazdiisky. The witness stated that said brothers did not speak Russian and only spoke the Lithuanian Baltic language. Under cross-examination, however, Joseph admitted that he had not communicated with them since he had left their country and had not heard from them until about four months before trial when he received a short uninformative letter from Vincas expressing a desire to hear from him. That letter had not been answered.
*309 Neither the testimony of Joseph nor any other testimonial or documentary evidence established plaintiff's contention that the power of attorney, drafted in the Russian and English languages (dual-columned form) and signed by the two heirs and next of kin, was not understood by them or that its execution was the result of coercion and duress. It is fundamental that evidence is essential to prove such an allegation. We cannot assume from the fact that the signers were familiar only with the Lithuanian language in 1913 (at which time they were 16 and 10 years of age respectively), that they were in 1959 (when the power was executed) incapable of knowing or understanding the foreign languages to which they had affixed their signatures. Indeed, it would be reasonable to expect that the people of a subjugated country would probably acquire, over a period of nearly 20 years, some basic acquaintanceship with the spoken tongue of the nationalizing authority under which their homeland became a satellite nation.
The vice-consul gave evidence as to his official position and explained that Lithuanian was the state language under the 1938 constitution of his country. He testified as to the history of Lithuania and the Soviet "take-over" which relegated his country to a Socialist Republic of the Soviet Union. The responsibility of his office is to the Chief of the Lithuanian Diplomatic Service residing in Rome. He said that notaries public occupied comparatively high offices, "tantamount to judges," and that they received their appointments from the Minister of Justice. Under cross-examination it was developed that the witness did not know of any notaries appointed by the Republic of Lithuania since its annexation; he said the Republic does not presently have a Minister of Justice.
The documentary facts are not in dispute. The identity of the surviving brothers, the authenticity of their signatures and their legal capacity, were certified February 19, 1959 by a notary of the Ministry of Justice of the Lithuanian Soviet Socialist Republic. The notary's qualification and signature were certified by the Chief of the Revisionary Department of *310 the Ministry of Justice of the Lithuanian Soviet Socialist Republic whose signature was visaed by the Consular Administration of the Ministry of Foreign Affairs of U.S.S.R. There was an accompanying certificate by an American consul certifying the authenticity of the Russian minister's signature and the official Russian seal; a caveat thereto stated, "This authentication is not to be interpreted as implying recognition of Soviet sovereignty over Lithuania."
The trial judge received a letter dated January 31, 1962 addressed to him from the United States Department of State which included the following information: the Government of the United States does not recognize the forced incorporation of Lithuania into the Union of Soviet Socialist Republics; it continues to recognize the diplomatic and consular officers of the Republic of Lithuania, and the position of the Department is the same as declared in a communique of October 1, 1959 declaring that the effect to be given a power of attorney executed in the Soviet Union by nationals of Lithuania is for the courts to decide.
It is well settled that the laws, acts, judgments and decrees of foreign governments have extraterritorial effect only as a matter of comity, sometimes called "comity of nations," which in a legal sense is "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." Hilton v. Guyot, 159 U.S. 113, 163-164, 16 S.Ct. 139, 143, 40 L.Ed. 95, 108 (1895), approvingly cited in Banco Nacional de Cuba v. Sabbatino, 84 S.Ct. 923 (decided March 23, 1964). Political recognition, however, is exclusively a function of the Executive. Ibid. When our Federal Government has determined upon a policy of recognition of a foreign country, it is binding upon the courts. United States v. Pink, 315 U.S. 203, 229-230, 62 S.Ct. 552, 565, 86 L.Ed. 796, 817 (1942). Similarly, a policy of non-recognition when demonstrated by the Executive must be deemed to be "as affirmative and positive in effect as the policy of recognition." The Maret, 145 F.2d 431, 442 (3 Cir. 1944). Accord, Latvian State Cargo & *311 Passenger S.S. Line v. McGrath, 88 U.S. App. D.C. 226, 188 F.2d 1000, 1003 (D.C. Cir.), cert. denied 342 U.S. 816, 72 S.Ct. 30, 96 L.Ed. 617 (1951).
Appellant contends that because the power of attorney here at issue was executed in subjugated Lithuania and the notarial acts appended to the power were sealed and consummated by officers of an unrecognized sovereignty, the document should be declared a total nullity. He relies upon the authority of cases typified by In re Adler's Estate, 197 Misc. 104, 93 N.Y.S.2d 416 (Surr. Ct. 1949), appeal dismissed 279 App. Div. 745, 109 N.Y.S.2d 175 (App. Div. 1951), wherein it was said that a court may not give effect to an act of an unrecognized government, since to do so would invade the domain of the political authority. It was then declared, "If, therefore, the court may not give effect to an act of an unrecognized government, it may not give effect to an act of an official acting in behalf of that regime." Id., 197 Misc., at p. 108, 93 N.Y.S.2d, at p. 419. See also In re Braunstein's Estate, 202 Misc. 244, 114 N.Y.S.2d 280 (Surr. Ct. 1952); In re Mitzkel's Estate, 36 Misc.2d 671, 233 N.Y.S.2d 519 (Surr. Ct. 1962); In re Kapocius' Estate, 36 Misc.2d 1087, 234 N.Y.S.2d 346 (Surr. Ct. 1962). But see Upright v. Mercury Business Machines Co., 13 A D 2d 36, 38, 213 N.Y.S.2d 417, 419 (App. Div. 1961).
We here note that, unlike New Jersey, the State of New York has a statute enumerating specific requirements with respect to the execution and recordation of powers of attorney dealing with decedents' estates. Vide N.Y. Personal Property Law, § 32-a. That fact should be borne in mind in considering the decisional precedents from our sister state.
The argument continues that it would be an anomalous situation if we were to give recognition to the notarial acts of those appointed under the laws of the "puppet regime" now in control of Lithuania, because it would be tantamount to an acknowledgment that the Russian laws were applicable to the Baltic country of Lithuania. But that does not necessarily follow. In the first place, the American consul's certification *312 was specifically qualified to negate such a conclusion, and, secondly, it is not every act of an official of an unrecognized government that is regarded as a nullity. While juridically a government that is unrecognized may be viewed as no government at all, it was pointed out many years ago by Justice (then Judge) Cardozo that in practice "juridical conceptions are seldom, if ever, carried to the limit of their logic, the equivalence is not absolute, but is subject to self-imposed limitations of common sense and fairness * * *." Sokoloff v. National City Bank, 239 N.Y. 158, 165, 145 N.E. 917, 918, 37 A.L.R. 712 (Ct. App. 1924).
It is only where the acts are political in nature that the courts are precluded from considering their validity and effectiveness. Russian Reinsurance Co. v. Stoddard, 240 N.Y. 149, 147 N.E. 703 (Ct. App. 1925). Thus, where the controversy is concerned exclusively with private rights and obligations of the subjects of an unrecognized state, the law of that state may prevail. M. Salimoff & Co. v. Standard Oil Co., 262 N.Y. 220, 186 N.E. 679, 89 A.L.R. 345 (Ct. App. 1933); The Denny, 127 F.2d 404 (3 Cir. 1942); Bank of China v. Wells Fargo Bank & Union Trust Co., 104 F. Supp. 59 (N.D. Cal. 1952); Upright v. Mercury Business Machines Co., supra. Note, Lubman, "The Unrecognized Government in American Courts; Upright v. Mercury Business Machines," 62 Col. L. Rev. 275 (1962). Also, Borchard, "The Unrecognized Government in American Courts," 26 Am. J. of Int'l Law 261 (1932).
A significant approach was taken to this issue in the recent case of In re Luberg's Estate, 19 App. Div.2d 370, 243 N.Y.S.2d 747 (App. Div. 1963), wherein two powers of attorney were involved  one executed and notarized in Estonia and the other at Leningrad, Russia. In considering the former, it was declared, by way of obiter dictum, that the judiciary is not required to disregard a power of attorney merely because it was authenticated by an official of a de facto rather *313 than a de jure government. If this were not so, rationalized the court,
"many situations would become intolerable. It would be impossible to establish the elementary facts of birth, marriage, death or the like where the certification of the same was made by, or the official before whom proof was to be taken was an appointee of, the unrecognized regime. Moreover, we would perforce have to refuse nationals of the regime that we do recognize access to our shores because the only persons who could in fact authenticate their passports would be officials of the regime that is not recognized. In that way we would be acting in a manner that was in practical effect more oppressive to those nationals whose independence we are seeking to further than is the government which usurped authority over them. * * *" (243 N.Y.S.2d, at p. 750.)
In the field of conflict of laws, the rule that the forum of juridical acts is governed by the law of the place of execution is one of the oldest and best established legal precepts in private international law. See Eder, "Powers of Attorney in International Practice," 98 U. of Pa. L. Rev. 840-863 (1950). An excerpt from the summation in that article is particularly noteworthy:
"The safest guide through the maze of Conflict of Laws should be the principle ut res magis valeat quam pereat [that it may rather become operative than null]. Barring considerations of grave public policy, no honest legitimate intention of a party should ever be frustrated by the application of technical rules of law of one or the other of the jurisdictions involved, especially as to matters of form. And the principle of public policy, ever a destructive factor in private international law, should be applied sparingly."
We are not concerned, in the case at bar, with international political questions or a treaty between countries, but rather only with the private rights of individual distributees of an estate who have executed a power of attorney to an American law firm. Appellant in his brief quotes from In re Mitzkel's Estate and In re Kapocius' Estate, supra, with the comment that it is apparent "from the foregoing" that the appointment of the designated agents (Messrs. Wolf, Popper, Ross, Wolf & Jones) was not the result of a free and independent act on *314 the part of decedent's brothers but was attributable to the "Iniurcolleguia," a body of Soviet lawyers in Moscow, under the control of the U.S.S.R. Ministry of Justice, organized for the purpose of exclusive representation of Soviet nationals in foreign legal matters. There is no evidence in the record before us that respondent is acting either directly or indirectly on behalf of an unrecognized government or any foreign person or party other than the principals who executed the power of attorney. Plaintiff may not, by innuendo, import into the record of the instant case facts that allegedly prevailed in other litigated controversies. We cannot indulge in surmise and speculation and, indeed, counsel in his brief remarks "How the two brothers came to be solicited to execute the document is a mystery."
Against the force of the evidence before us, we find appellant's countervailing arguments, attacking the validity of the power of attorney in question, to be unpersuasive.

THE CLAIM OF EXCLUSIVE RIGHTS
Broadly speaking, foreign consular agents are deemed to be international attorneys-in-fact for their nationals who are not otherwise represented or present to act for themselves. Such diplomatic officials have a duty to protect the property rights of their countrymen and, in the discharge of their official responsibility, they are accorded the right to make judicial appearances. Even in the absence of specific authorization to act as personal agents, consuls who have been duly recognized by our government may have, under the principles of international law and comity, the authority and privilege to represent citizens of their countries in our courts. Zolezzi v. Tarantola, 138 N.J. Eq. 579, 581 (Ch. 1946). See generally 3 C.J.S. Ambassadors and Consuls § 15b, p. 1027 (1936); 16 Am. Jur., Diplomatic and Consular Officers, § 13, p. 965 (1938); Puente, "Consular Protection of the Estates of Deceased Nationals," 23 Ill. L. Rev. 635, 636 (1929).
*315 Under N.J.S. 3A:6-4 the surviving spouse and next of kin have the sole right to apply for letters of administration within the first 40 days after the death of an intestate. In Simoni v. D'Ippolito, 8 N.J. 271, 276 (1951), our Supreme Court said that after the aforesaid statutory period "a consul of a foreign country which has a treaty with this government has the right and privilege to apply for appointment as and to serve as an administrator where the decedent was a national of such foreign country or where the heirs and next of kin are nationals of such country," citing authorities including In re Tenneson, 18 N.J. Misc. 245, 12 A.2d 363 (Orph. Ct. 1940), which stands for the proposition that a consular right to an appointment as administrator of an estate is neither paramount nor exclusive.
In Tenneson there was a treaty between the Kingdom of Norway and the United States which included "the most favored nation clause," and it was maintained, as a result thereof, that the Norwegian Consul General had an exclusive right to the administration of estates of his subjects who may die intestate in this State. In holding that such a right, even under treaty, was not exclusive nor superior the court said: "Consuls are given the right to be one of those who may be appointed as administrator, and this qualifies them as proper parties to receive letters of administration. It does not exclude others ordinarily entitled to letters." Id., 18 N.J. Misc., at p. 246, 12 A.2d, at p. 364. It was also pointed out in that decision that the right of administration grows out of the right to distribution, and that all factors which are pertinent to the best interests of the distributees should be taken into consideration. The court there took judicial notice of the "chaos" in the Kingdom of Norway as the result of the German invasion, and refused to appoint the consul general as administrator of the estate, denied the application for appointment by a creditor and, under the circumstances of that case, appointed a stranger.
It is appropriate at this point to observe the testimony of Vice-Consul Simutis indicating the inefficacy of the consular *316 agency in any possible dealings with the nationals, in the pending litigation, whose beneficial interests are sought to be protected. He testified that his office had not made any endeavor to communicate with the decedent's brothers, expostulating:
"* * * You see, those people are all in danger. If any outside Lithuanian official would contact or write to them, they might be put in prison under the Bolshevik rule. * * * In Lithuania  in Soviet occupied Lithuania right now, any person having contacts with so-called capitalist countries may be punished, so we as Consulates in Lithuania, if we contact them directly, these people might be imprisoned for having contacts, so we don't have contact."
When he was further interrogated by the court, "How about the situation if the Consulate Services of the Republic of Lithuania wrote to them. Would that make a difference?" the witness replied, "Very great difference. They [the brothers] would be considered communicating with the enemies of the Soviet Union."
That plaintiff is persona non grata with the present de facto government of Lithuania is apparent. The avowed attitude of total detachment from his nationals without any plan, program or suggestion as to how plaintiff could safeguard or represent their best interests, or even establish contact with them, might well suggest doubt as to the advisability of designating Budrys as a fiduciary appointee. We express no opinion on that question as the controlling facts before us make it unnecessary to do so.
Consular intervention may ofttimes be the most effective way to protect the fundamental rights of aliens in decedents' estates. It is a most important function of such an office. "United Nations, Report of the International Law Commission," 56 Am. J. Int'l L. 268, 282-285 (1962). But the authority of a consulate agency terminates if and when the national selects other representation. In re Luberg's Estate, supra (19 A.D.2d, at p. 374, 243 N.Y.S.2d, at p. 752); In re D'Adamo's Estate, 212 N.Y. 214, 223-224, 106 N.E. 81, 84 (Ct. App. 1914); cf. In re Zalewski's Estate, *317 292 N.Y. 332, 339, 55 N.E.2d 184, 187-188 (Ct. App. 1944); see also Boyd, "Consular Functions in Connection with Decedents' Estates," 47 Iowa L. Rev. 823, 826-827 (1962).
We conclude that plaintiff did not have an exclusive right to be appointed administrator and that any standing he might have had prior to February 19, 1959, terminated at that time when decedent's brothers designated attorneys in this country to represent them.
The judgment of the trial court is affirmed with directions consonant with the opinion of our Supreme Court in In re Estate of Alexandravicus, supra (35 N.J., at p. 238), and, in particular, that the order appointing Jesse Moskowitz as administrator should contain provisions for the customary bond and that "no distribution to or on behalf of the brothers in Lithuania be made except on court order pursuant to hearing upon notice duly addressed to the Attorney General of New Jersey as well as the persons beneficially interested in the estate and specifically calling attention to N.J.S. 3A:25-10."