423 A.2d 333

In re COMMONWEALTH of Pennsylvania ex rel. Thomas
ZAUBI and Kirstine Inez Zaubi

v.

Thomas Anthony ZAUBI, Thomas Zaubi and Francis Zaubi.

**Appeal of Thomas Anthony ZAUBI.**

Supreme Court of Pennsylvania.

Argued April 14, 1980.

Decided Sept. 22, 1980.

Reargument Denied Jan. 5, 1981.

Debbie O'Dell, Anthony J. Seneca, Washington, for appellants.

Ewing B. Pollock, Waynesburg, for appellees.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

■ This is an appeal from an order of the Superior Court reversing a custody decree of the Court of Common Pleas of Greene County. The court of common pleas determined that a Danish custody decree in favor of appellee, Marianne Hoemje, should be modified and custody awarded instead to appellant, Thomas Zaubi. The Superior Court, however, unanimously determined that, in modifying the Danish decree, the court of common pleas had incorrectly applied the Uniform Child Custody Jurisdiction Act, P.L. 29, §§ 1 et seq., 11 P.S. §§ 2301 et seq., effective July 1, 1977 (hereinafter "Act"). We agree with the Superior Court that the Act compels Pennsylvania courts not only to recognize valid custody decrees from foreign nations but also to decline to accept jurisdiction to modify custody decrees in the absence

of a showing, based on evidence not previously considered, of conditions in the custodial household that are physically or emotionally harmful to the children. Because appellant failed to make such a showing, we affirm the order of the Superior Court.

The facts of this case are more fully set forth in the opinion of the Superior Court at 275 Pa.Super. 294, 418 A.2d 729 (1980). In essence, however, appellee Marianne Hoejme, a Danish citizen, was granted custody of her children in Denmark after numerous hearings and an appeal by her husband, appellant Thomas Zaubi, to the High Court of Denmark. At all of these proceedings, appellant was present and represented by counsel. On June 16, 1977, appellee received a final divorce decree. At this time appellant was able to appeal his case once more to the High Court of Denmark, and a hearing was scheduled for November 17, 1977. In August 1977, while the children were in his care during a visitation period, and while his custody appeal was pending, appellant fled with the children to the United States.[1]

Upon returning to the United States, appellant concealed the whereabouts of the children from their mother for over eight months by shuttling them between Cleveland and Nemacolin. At no time during this period were they enrolled in school. When appellee finally located the children in May 1978, she filed a Petition for a Writ of Habeas Corpus in the Court of Common Pleas of Greene County to obtain enforcement of the Danish custody decree. Service was effected on the Zaubi family in Nemacolin, but appellant again fled with the children to avoid the court's jurisdiction, returning only after the court had issued a contempt citation against his parents.

## I

Among the purposes for which our Legislature enacted the Uniform Child Custody Jurisdiction Act of 1977 is the

---

1. As a result of his actions, the Danish authorities have charged appellant with kidnapping. A warrant for his arrest awaits him if he should attempt to return to Denmark.

deterrence of "abductions and other unilateral removals of children undertaken to obtain custody awards." 11 P.S. § 2302(a)(5).

Section 9(b), 11 P.S. § 2309(b), provides that

"(b) Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state the court may decline to exercise its jurisdiction unless the petitioner can show that conditions in the custodial household are physically or emotionally harmful to the child, the burden of proof being on the petitioner requesting the court to take jurisdiction."

As used in the above section, "petitioner" clearly refers to the party seeking modification of the custody decree.[2] It does not refer, as the dissenting opinion would have it, to an "innocent" party who, as here, is merely seeking the enforcement of a valid custody decree rendered in another jurisdiction and who happens to have been the first to petition the court to act.

 Since section 9(b) undoubtedly applies to the Greene County proceedings, the next question is what showing the petitioner for modification must make under that section in order for the Greene County court to be permitted to exercise its jurisdiction to modify the valid Danish decree. On the one hand, in cases where the petitioner has improperly abducted the children, a court "shall not exercise its jurisdiction to modify" "[u]nless required in the interest of the child" (that is, in the words of the commissioner's note,

2. See Uniform Child Custody Jurisdiction Act (U.L.A.) § 8, Commissioner's Note and cases cited; e. g., *Leathers v. Leathers*, 162 Cal. App.2d 768, 328 P.2d 853 (1958) (courts will usually enforce decrees of sister states by invoking "clean hands" doctrine when there has been misconduct by the "parent seeking reexamination").

"unless the harm done to the child by a denial of jurisdiction outweighs the parental misconduct"). On the other hand, in cases of less flagrant violations of custody decrees, a court "may decline to exercise its jurisdiction unless the petitioner can show that conditions in the custodial household are physically or emotionally harmful to the child...." [3] We cannot conclude from this language that the Act places a lesser burden on a petitioner who, as here, has abducted his children than on one who has simply violated some other provision of a custody decree. Such a conclusion defies not only the stated purposes of the Act but common sense as well. It is inconceivable that in replacing the vague language of the Uniform Act with a more definite and rigorous standard, our Legislature intended to make it easier for a parent who abducts his children to obtain the modification of a custody decree than for a parent who otherwise violates a valid decree. Thus, the courts below were correct in their determination that a showing of "physically or emotionally harmful" conditions in the custodial household was a necessary prerequisite to the exercise by the Greene County court of its jurisdiction to modify the Danish decree.

## II

Two questions remain: (1) what evidence could the Greene County court properly consider in determining whether harmful conditions existed; and (2) in light of this evidence, has appellant met his burden of proof? The Greene County court held that appellant had shown the existence of conditions sufficiently harmful to require a change of custody. However, the court based its decision almost entirely upon factual issues which had previously been litigated and resolved against appellant in the Danish courts.[4] As the Superior Court correctly observed, the

3. Our Legislature substituted the above language when it adopted the Act. In the Uniform Act this phrase reads "may decline to exercise jurisdiction if this is just and proper under the circumstances."

4. The court also expressed concern that if appellee returned to Denmark with her children after enforcement of the Danish decree, appellant would be unable to visit them because of the outstanding

Greene County court erred in failing to defer to the findings of those courts.

■ Section 13 of the Act provides that "a custody decree rendered by a court of this State . . . binds all parties . . . who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard. As to these parties, the custody decree is conclusive as to all issues of law and fact decided and as to the custody determination made unless and until that determination is modified pursuant to law, including the provisions of this act." 11 P.S. § 2313. Such conclusiveness was obviously intended to extend to custody decrees of other states as well, for it would be unthinkable for the Legislature, in adopting a uniform act, to pronounce the decrees of its own courts res judicata while denying similar effect to the decrees of sister states.

Appellant had proper notice and opportunity to be heard; indeed, a hearing date had been scheduled for his second appeal to the High Court of Denmark at the time appellant fled to the United States with his children. To say, as the dissenting opinion does, that in this situation a Pennsylvania court "may even exercise its independent judgment on the same facts that determined the foreign state's order, "*Irizarry Appeal*, 195 Pa.Super. 104, 108, 169 A.2d 307, 309, cert. denied, 368 U.S. 928, 82 S.Ct. 363, 7 L.Ed.2d 191 (1961), is to ignore the intent of the Legislature in adopting the Act in 1977 and to issue an open invitation from the courts of Pennsylvania to those who, like appellant, would take the law into their own hands.[5]

warrant for his arrest in that country. See note 1, supra. It was clearly inappropriate for the court to consider this factor in appellant's favor in making its determination.

5. The dissenting opinion observes that to interpret § 15(b) of the Act (courts shall give "due consideration" to record of previous proceedings) as "usurping the hearing court's right to exercise its independent judgment on the same facts that determined the foreign order . . . would require a jurisdiction to give greater deference to a foreign award than would be allowed under its laws to its own pronouncements in this area." It should be noted, however, that in adopting

■ Because section 13 of the Act makes conclusive all issues determined by the valid Danish decree, in the proceedings before the Greene County court appellant had the burden of proving by evidence not previously considered that conditions in appellee's household were "physically or emotionally harmful to the child[ren]." Appellant did not meet that burden. Instead he evaded the jurisdiction of the Danish court, flouted its decree, and relitigated in a "friendlier" forum the very issues which the Danish court had decided against him. Such a result is precisely what the 1977 Uniform Child Custody Jurisdiction Act is intended to prevent. The sound analysis of the Superior Court fully reflects our Legislature's intent in adopting the Uniform Act.

The unanimous order of the Superior Court is therefore affirmed.

LARSEN, J., joined the Opinion of the Court and filed a concurring opinion.

NIX, J., filed a dissenting opinion in which FLAHERTY and KAUFFMAN, JJ., joined.

LARSEN, Justice, concurring.

I join the majority opinion without reservation. However, I am compelled to respond to the dissenting opinion of Mr. Justice Nix as it unfairly characterizes the majority opinion and distorts the Uniform Child Custody Jurisdiction Act (the Act).

Initially, I cannot fathom where the dissent got the notion that, somehow, the majority opinion has "implicitly resurrected" the tender years doctrine. This notion certainly could not have originated with either the majority opinion or the opinion of the Superior Court as both opinions are based

section 13 of the Commonwealth Child Custody Jurisdiction Act, P.L. 108, § 13, 11 P.S. § 2413, effective June 27, 1978 (a provision exactly similar to section 13 of the Uniform Act adopted a year earlier), the Legislature required that the courts of this Commonwealth give the same effect to their own custody decrees as they had previously been required to give to decrees of courts in sister states.

entirely *and explicitly* on the interpretation and application of the Act. If the tender years doctrine was *implicitly* resurrected, it would behoove the dissent to point out what specific language creates such an implication. That the dissent fails to do so should come as no surprise to anyone, as no such language exists. Indeed, if any "previously repudiated doctrine" has been resurrected, it is the "doctrine" *implicit* in the dissenting opinion that the courts can be a super–legislature free to ignore even the clearest pieces of legislation.

In fact, the majority opinion is sex–neutral. If the situation of the parents were reversed (that is, if the mother had kidnapped and concealed her children in violation of a valid custody decree, and then attempted to relitigate the issues decided by that decree) the majority interpretation of the Act would compel a decision in favor of the father just as surely as the decision herein in favor of the mother was compelled by the Act. The mere happenstance that the decision was favorable to the mother cannot, without much more, "imply" the resurrection of the tender years doctrine.

Further, the majority opinion does not, as the dissent asserts, disregard the best interests of the child in favor of "our jurisprudential need for greater finality in [custody] decrees." It simply recognizes that, in the judgment of the legislature in adopting the Act, greater finality in custody decrees *is in the best interest of the child.* To avoid the unsettling effect on a child's life of repeated litigation of the same custody issues in diverse jurisdictions, the legislature, through the Act, has mandated that courts of this Commonwealth defer to the findings and conclusions of law of the original trier of fact and modify a custody decree *only* upon a showing of changed circumstances arising *after* the entry of that decree.

Moreover, in applying the provisions of the Act, the Superior Court did not, as the dissent also asserts, "ignore" the litany of "facts" presented in the dissenting opinion. Rather, the Superior Court correctly determined that most of the facts on which the Greene County Court based its decision

had previously been considered by the Danish courts, and had been decided adversely to the father, and that the remaining "facts" were not sufficient to show the existence of "conditions in the custodial household [which] are physically or emotionally harmful to the child," as required by section 9(b) of the Act.[1] 11 P.S. § 2309(b). In short, the "facts" were found to be untrue.

Finally, I am amazed at the dissent's reliance on the limitations of the Full Faith and Credit Clause and on pre–1977 cases to support its argument that courts may reexamine and redecide issues resolved by prior custody decrees. Whatever validity this argument may have had before July 1, 1977, the Act has long since robbed it of its efficacy. In enacting the Uniform Child Custody Jurisdiction Act, the legislature has mandated *by statute* that courts of this Commonwealth give full faith and credit to valid custody decrees. This statute overrules prior Pennsylvania cases holding to the contrary and may not be judicially tampered with simply because some members of this Court disagree with the method chosen by the legislature to safeguard the best interests of the child.

NIX, Justice, dissenting.

I am forced to dissent from the view expressed by the majority in this appeal because it distorts the legislative intention reflected in the Uniform Child Custody Jurisdiction Act (Act).[1] Regrettably, as a result of that mistaken interpretation, two small human beings of tender years, the subjects of the controversy, have had their best interest subordinated in an effort to avoid a jurisdictional conflict, thereby violating the cardinal principle in custody matters.

1. The "uncontroverted" testimony to which the dissent refers was given at the Greene County hearing by the father, his mother, and his sister, and purported to describe events during the period when the father's family was actively engaged in concealing the children from their mother.

1. Act of June 30, 1977, P.L. 29 §§ 1 *et seq.*, 11 P.S. §§ 2301 *et seq.*, effective July 1, 1977.

Thomas Zaubi, Jr., born July 29, 1970, and Kirstine Inez Zaubi, born November 2, 1973, were four years, eight months old and one year, four months old, respectively, when their mother, Marianne Højme (Hoejme) began an international seize, run and sue pattern by taking them in April 1975 to live in Copenhagen, Denmark without their father's consent. The parents had been married on May 9, 1968. The couple lived in Denver, Colorado; Cannonsburg, Pennsylvania; Denmark; Nemacolin, Pennsylvania; and Cleveland, Ohio. However, with the aid of an aunt employed in the Danish Embassy in Washington, D. C., Marianne covertly had her children, who were American citizens, included on her passport, and returned with the children to Denmark around April 3, 1975. Unable to locate his family's whereabouts, Thomas, Sr. tried to forestall the mother's seize and run child snatching by seeking a temporary restraining order against the then Secretary of State, Henry Kissinger, so that an American passport might not be issued to the mother. Ironically, the father failed on April 11, 1975 because (1) there was no existing court order of custody, (2) there was no showing of irreparable injury, (3) such an order was not in the public interest and (4) the children were probably already in Denmark. *Zaubi v. Kissinger*, United States District Court, D. C. (Civil Action 75–424, April 11, 1975). The father followed his family to Denmark the next month. Three days before the father's case was heard in Washington, D. C., the mother had won the race to the courthouse door by obtaining an ex parte temporary custody order dated April 8, 1975 from Copenhagen County. Her seize and run became seize, run and successfully sue. She took up temporary residence with her parents, obtained a nursing position.[2] On November 27, 1975 the separation was officially ordered by the Danish court and the mother given custody of the two children. On April 13, 1976, the father's appeal from the custody award (because of the limitations placed upon his visitations with the children by the mother), was denied by the High Court of Justice for the Eastern District of Denmark.

**2.** Subsequently the mother obtained her own apartment.

In the summer of 1976 the father reported the maternal grandfather to the Danish police for committing acts of sexual indecency towards Thomas, Jr. The record is unclear as to the reason that case was not determined. On October 28, 1976, *the children's names were officially changed to* Thomas Højme (Hoejme) and Kirstine Højme (Hoejme). On April 5, 1977, Kirstine (then age three years, five months) and Thomas (then six years, eight months) were naturalized as Danish citizens, effective April 6, 1977. On June 16, 1977 the mother obtained a divorce decree and an award of custody of the two youngsters, in spite of the father's claim for custody. In that case the court noted the father's report to the police of the grandfather's conduct and cursorily disposed of the matter as follows:

The case was dropped. The petitioner [the mother] feels that the whole matter was due to 'prattle' on the part of Thomas [Jr.].

On August 18, 1977 the father, still placing second in the courthouse races, was naturalized as a Danish citizen, retroactive to June 15, 1977. He had appealed the judgment of custody to the High Court of the Eastern Judicial District of Denmark. On August 30, 1977 Thomas, Sr. was given the right of visitation with both children, in Denmark, on the first and third Sunday of each month from 9:00 a. m. until 6:00 p. m. provided he deposit his own passport and the children's United States passports "as well as any other travel documents concerning [the children]" with "the chief of police in the police district in which the wife [sic] is domiciled." On October 16, 1977, still placing second in the seize and run process begun by the mother, the father flew the children to the United States. Unlike the legal response in American courts to the mother's initial seize and run tactics, the father's conduct constituted a crime under Danish law. He was committed to prison *in absentia*, and extradition requested.

The mother located the children's whereabouts and on May 15, 1978 filed a petition for a writ of habeas corpus to regain custody in the Court of Common Pleas of Greene

County, Pennsylvania. The children had been first at their paternal aunt's home in Cleveland, Ohio; then at their paternal grandparents in Nemacolin, Greene County, Pennsylvania, under such close surveillance Thomas, Jr. was not placed in school. Kirstine, age three at the time, was not of school age. The hearing scheduled on the May 15th petition for May 18th did not occur because a special appearance was entered on behalf of the father moving for dismissal for lack of jurisdiction. Upon denial of the motion, a rule to show cause why the father and paternal grandparents should not be held in contempt was issued. A contempt conviction and sentence thereon was entered against the grandparents with the right to purge themselves of the contempt by production of the children.

Finally the matter was heard on the merits on June 20 and 21, 1978. The hearing judge, on July 28, 1978, awarded custody to the father under supervision of the Children and Youth Services of Greene County with the mother having summer custody, the father to pay travel expenses and support during visitation in Denmark.

The mother appealed to the Superior Court of Pennsylvania, which vacated the lower court, restored custody to the mother and authorized her to take the children to Denmark. The father was allowed to appeal to this Court on March 6, 1980.

## II.

The lower court determined "the best interest of the children" would be served by modification of the foreign custody award. On appeal, the Superior Court reversed holding that the Uniform Child Custody Act [Act], Act of June 30, 1977, P.L. 29 §§ 1 et seq., 11 P.S. §§ 2301 et seq., effective July 1, 1977,[3] compelled the lower court "not only

3. The purposes of the Commonwealth's enactment of the Act are essentially "to promote finality in custody litigation, insure the stability of the child's home environment, provide for a fully informed judgment by the appropriate court, avoid jurisdictional conflicts between states, and provide for recognition of out–of–state custody decrees." Note, Jurisdiction–Uniform Child Custody Jurisdiction

[to] recognize proper custody decrees from foreign nations, ... but also that they (the Court of Common Pleas of Greene County) decline to accept jurisdiction to modify custody decrees in the absence of [a] showing of conditions in the custodial household that are physically or emotionally harmful to the children." 275 Pa.Super. 294, 299, 418 A.2d 729, 731 (1980).

To begin our analysis of the questions raised, it is appropriate to first consider the significance of a foreign custody decree. It must be recognized: "No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived." *Hilton v. Guyot*, 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895). Under the U. S. Constitution, Art. IV, § 1, there is a constitutional directive requiring the states to accord full faith and credit to the final judgments of sister states. U.S.Const., Art. I. There is no comparable provision in our federal constitution requiring recognition of judgments and decrees of courts of foreign nations. However, this nation early in the development of its jurisprudence recognized the wisdom of the concept of "comity of nations" where the substantive law of the foreign sovereign is not repugnant to our own and the procedural prerequisites are consistent with our concepts of due process.

> The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations.' Although the phrase has been often criticized, no satisfactory substitute has been suggested.
>
> 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But is the recognition which one

Act–1977 Pa.Laws No. 20 §§ 1–27, 51 Temple L.Q. 139 (1978). See 11 P.S. § 2302. The predicate for the underlying premises of the Act is that among the perils of childhood is the harm done children who are not given a stable environment and continuity of emotional attachment.

nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws...

*Hilton v. Guyot, supra* at 163–64, 16 S.Ct. at 143.

The concept of "comity of nations," although not possessing constitutional stature has nevertheless obtained wide acceptance,[4] particularly in those areas where it is deemed necessary to avoid jurisdictional conflicts and where cooperation can be achieved without prejudice to the rights of the party litigants involved. Thus it was not unexpected that the Act would seek to embrace this concept by the addition of section 24 to its provisions. Section 24 provides:

The general policies of this act extend to the international area. The provisions of this act relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody institutions rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons.[5]

We, therefore, proceed to examine the questions at issue in this appeal recognizing that the concept of "comity of nations" has been given legislative approval in custody matters. A finding that section 24 is applicable to the instant case would necessarily require, albeit as a result of legisla-

4. *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435 (3d Cir. 1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972); *In re Christoff Estate,* 411 Pa. 419, 192 A.2d 737 (1963), *cert. denied,* 375 U.S. 965, 84 S.Ct. 483, 11 L.Ed.2d 414; *Adamsen v. Adamsen,* 151 Conn. 172, 195 A.2d 418 (1963); *Ogden v. Ogden,* 159 Fla. 604, 33 So.2d 870 (1947); *Hager v. Hager,* 1 Ill.App.3d 1047, 274 N.E.2d 157 (1971); *In re Alexandravicus Estate,* 83 N.J.Super. 303, 199 A.2d 662 (1964); *State ex rel. Domico v. Domico,* 153 W.Va. 695, 172 S.E.2d 805 (1970).

5. This section was drafted by the late Conflict of Laws expert, Professor Elliott Cheatham. Bodenheimer, The International Kidnapping of Children: The United States Approach, 11 Family L.Q. 83 (Sp.1977).

tive fiat rather than as a constitutional mandate, the instant Danish decree to be accorded the same status as a decree emanating from one of the sister states.

The applicability of section 24 is dependent upon whether the decree was issued by a "legal institution similar in nature to custody institutions" rendering comparable judgments in this nation and that "reasonable notice and opportunity to be heard [was given to all] affected parties." In this case, the applicability of section 24 was properly conceded. Thus, for purposes of the Act, the Danish decree awarding custody to appellee must be treated in the same manner as if it had been issued by a court of a sister state.

Next, we must turn to the question of the jurisdiction of the Court of Common Pleas of Greene County. The pertinent section in this regard is section 4. We are satisfied that jurisdiction in the Common Pleas Court of Greene County has been established under section 4(a)(1)(i). Section 4(a)(1)(i) provides:

> (a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
>
> (1) this state:
>
> (i) is the home of the child at the time of the commencement of the proceeding;

The term "home state" has been defined by the Act in section 3 as:

> Home State. The state in which the child immediately preceding the time involved lived with his parents, a parent, in an institution or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six–month or other period.[6]

6. The only other forum that could possibly have qualified as the home state would have been Denmark. Section 4(a)(1)(ii) would have permitted the Denmark Court to have exercised jurisdiction within six months of the time the children were removed from that

The record reveals the children were brought into Pennsylvania where they "lived" with their father for a little over eight months prior to the institution of the instant habeas corpus action.[7] Although the children were shifted in and out of the state, the absences were only temporary in nature and, therefore, includable for the computation of the six-month period.[8] It is therefore apparent and not contested by the majority that the Court of Common Pleas of Greene County had jurisdiction over the matter when it entertained the petition for habeas corpus instituted by the appellee.

The majority has followed, what I perceive to be the error of the Superior Court in focusing upon whether the conduct of appellant should have provided a basis for the lower court to decline to exercise jurisdiction. Section 9 sets forth three separate situations where a court, which has jurisdiction under section 4, *shall or may* decline jurisdiction. The section introduces in the Act the concept of the equitable "clean hands" doctrine. *See Ehrenzweig, Interstate Recognition of Custody Decree,* 51 Mich.L.Rev. 345 (1953). Section 9 provides:

Jurisdiction declined by reason of Conduct

country. However, that Court was not called upon to act within the time prescribed under 4(a)(1)(ii) and eight months had elapsed when the lower court was called upon to exercise jurisdiction.

7. The definition of "Home state" uses the term "immediately preceding the time involved" for purposes of the six-month computation. This term is necessarily general in order that it might encompass the various situations that could arise. In this instance, however, that general term is modified by the more specific term provided in 11 P.S. § 2304(a)(1)(i): "the commencement of the proceeding." The rules of statutory construction therefore dictate that in order to find a given jurisdiction to be the "Home state," the child must have lived with a parent or institution acting as a parent for six consecutive months "immediately preceding the commencement of the proceeding." *See* 1 Pa.C.S.A. § 1903(b), 133 (Supp.1978–1979).

8. From the testimony, it appears that when appellant and his children first returned to this country after the Danish custody decree was entered, they moved between appellant's parental home in Nemacolin, Pennsylvania and his sister's home in Ohio during a period of adjustment. However, the testimony indicates that appellant's intent throughout the period was to establish residence in Pennsylvania.

(a) If the petition for an initial decree has wrongfully taken the child from another state or has engaged in conduct intending to benefit his position in a custody hearing conduct the court may decline to exercise jurisdiction if this is just and proper under the circumstances.
(b) Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state the court may decline to exercise its jurisdiction unless the petitioner can show that conditions in the custodial household are physically or emotionally harmful to the child, the burden of proof being on the petitioner requesting the court to take jurisdiction.
(c) In appropriate cases a court dismissing a petition under this section may charge the petitioner with necessary travel and other expenses, including attorneys' fees, incurred by other parties of their witnesses.

Section 9(a) applies to cases in which a custody decree has not yet been rendered in any state. In those instances the court is given discretion as to whether to entertain the action. The only guideline supplied by the Act in the exercise of that discretion is that the court's decision must be "just and proper." The mother's initial seize and run conduct is addressed in section 9(a). The clean hands principle has been extended to such cases in which a custody award has not yet been made.[9]

---

**9.** 'Wrongfully' taking under this subsection does not mean that a 'right' has been violated–both husband and wife as a rule have a right to custody until a court determination is made–but that one party's conduct is so objectionable that a court in the exercise of its inherent equity powers cannot in good conscience permit that party access to its jurisdiction.
Uniform Child Custody Jurisdiction Act (U.L.A.) § 8, Commissioner's Note, p. 143.

Subsection (b) does not come into operation until after there has been an initial custody decree entered. It is specifically directed at a request for modification of the earlier decree. It differentiates between (1) the taking or the retention of the child and (2) other violations of the existing decree.

In the case of illegal removal or retention in violation of an existing decree, refusal of jurisdiction is mandatory unless the harm done to the child by the denial of jurisdiction outweighs the parental misconduct. In the case of violations of the decree other than an unlawful taking or retention, the right to decline the exercise of jurisdiction is discretionary with the burden of proof being on the petitioner to establish that the exercise of jurisdiction is necessary to show that conditions in the custodial household are physically or emotionally harmful to the child.[10]

It is clear that this adoption of the "clean hands" concept was not intended to be as stringently applied in custody cases as it is in other areas of the law. In custody cases the polestar is at all times the best of the child. Thus parental misconduct cannot be permitted to cause the court to be

10. It is obvious that the majority and the Superior Court are confused in their reading of section 9(b). They apply the physically and emotionally harmful test to a situation where the asserted conduct was one of an unlawful taking of the minor out of a jurisdiction in violation of an existing custody order. Under the format of section 9(b), two separate and distinct situations are provided for, which should not be intermingled. The first sentence of section 9(b) uses the language "unless required in the interest of the child. . . ." This test not only embodies the physically and emotionally harmful test of the second sentence, but is more encompassing in order for the Act to comply with what has been deemed probably the requirement of every State in the Union; i. e., courts are required to put the child's interest first. *Ford v. Ford*, 371 U.S. 187, 83 S.Ct. 273, 9 L.Ed.2d 240 (1962). Pennsylvania has long so held. *In re Sagan*, 261 Pa.Super. 384, 388, 396 A.2d 450, 452 (1978); *Comm. ex rel. Logan v. Tooney*, 241 Pa.Super. 80, 85, 359 A.2d 468, 470 (1976); *Comm. ex rel. Hickey v. Hickey*, 216 Pa.Super. 332, 337, 264 A.2d 420, 422 (1970). The need for the expanded exception in the first sentence of section 9(b) is because that is the only instance where there is a mandatory directive to decline jurisdiction. Reading the exception as anything short of the best interest of the child would be repugnant to the basic law in this area.

insensitive to the minor's well being. That the legislature was aware of this crucial fact is reflected by the exception to the mandatory language in the first sentence of subparagraph (b). Whether section 9 makes mandatory or discretionary the decision to decline jurisdiction in either event it was not intended for the court to decline the exercise of jurisdiction where the child would suffer as a consequence.

The fact that has been missed by the majority is that section 9 is clearly not applicable to this case. Section 9 is only germane where the parent seeking to invoke the court's jurisdiction is charged with unclean hands because of some misconduct. Here the only parental misconduct alleged was that of appellant in taking the children and fleeing from Denmark in violation of the order. However, it was not appellant who invoked the jurisdiction of the Greene County Court but rather appellee. Had the appellant attempted to invoke the jurisdiction of the Greene County Court, then a determination of the effect of section 9 would have not only been appropriate but necessary to the proper resolution of the issue. Appellee instituted the habeas corpus action to enforce the Danish decree. Once the Greene County Court was satisfied of its jurisdiction under Section 4, there was no reason to decline jurisdiction by reason of conduct of the appellee.

While the majority would have us apply the term "petitioner" to a party seeking change in the status of custody as a *defense* to a custody action brought by one who had previously been awarded custody, as here. *Black's Law Dictionary*, in defining "petitioner", says:

> Petitioner. One who presents a petition to a court, officer, or legislative body. In legal proceedings begun by petition, the person against whom action or relief is prayed, or who opposes the prayer of the petition, is called the 'respondent.' . . . .

When the Act was passed, our Legislature did not define the word "petitioner" although it contains a section of definitions, 11 P.S. § 2303; deleted "in similar reprehensible" from the 1968 Uniform Child Custody Jurisdiction Act and substituted "in conduct intending to benefit his position

in a custody hearing" in section 9(a); and deleted "if this is just and proper under the circumstances," from the 1968 Uniform Child Custody Jurisdiction Act and substituted "unless the petitioner can show that conditions in the custodial household are physically and emotionally harmful to the child, the burden of proof being on the petitioner requesting the court to take jurisdiction" in section 9(b). Yet our Legislature saw fit to define "petitioner" to include a person seeking custody change as a defense when it enacted the intrastate Commonwealth Child Custody Jurisdiction Act [11] in 1978. If the Legislature had intended the reading given by Mr. Justice Roberts, it would have defined "petitioner" in the Act as it did in the Commonwealth Child Custody Jurisdiction Act, *supra*. Since it did not so define, it did not so intend such a broad and unusual definition of the traditional appellation.

To interpret section 9 as forcing a court to decline jurisdiction where the respondent may not have had clean hands would be an absurd construction which must be rejected. 1 Pa.C.S.A. § 1922(1) (Supp.1978–79). It is also contrary to the express language of the section which refers to the misconduct of the petitioner. 1 Pa.C.S.A. § 1903(a) (Supp. 1978–79). It is thus apparent that the Superior Court erred when it concluded that the lower court should have declined jurisdiction under section 9 because of the behavior of appellant.[12]

Having concluded that the lower court had jurisdiction under section 4 of the Act and that section 9 did not require the court to decline the exercise of that jurisdiction, the only question remaining is whether the court in the habeas corpus action had the authority to modify the Danish decree.

11. Act of April 28, 1978, P.L. 108, No. 47 §§ 1 *et seq.*, 11 P.S. §§ 2401 *et seq.*

12. The fact that the court ultimately modified the decree in favor of appellant is not controlling. What is determinative is that appellee petitioned the lower court to exercise its jurisdiction in a habeas corpus proceeding. Having once determined to exercise that jurisdiction, the power to modify was merely one of the powers available to the court to resolve the dispute.

Two sections of the Act are particularly germane to this question. Section 13 which provides for the binding force and *res judicata* effect of those foreign decrees, nevertheless recognizes the right of modification "pursuant to law . . ." [13] The right of modification is expressly set forth in the Act in section 15. Section 15 provides in pertinent part:

Modification of custody decree of another state.

(a) If a court of another state has made a custody decree, a court of this State shall not modify that decree unless:

(1) it appears to the court of this State that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this act or has declined to assume jurisdiction to modify the decree; and

(2) The court of this State has jurisdiction.

(b) If a court of this State is authorized under subsection (a) and 9 to modify a custody decree of another state it shall give due consideration to the transcript of the record and other documents of all previous proceedings submitted to it in accordance with section 23.

This section is consistent with rulings of the Supreme Court which has refrained from deciding whether the Full Faith and Credit Clause of the Constitution applies in child custody cases. In *Ford v. Ford, supra,* 371 U.S. at 192, 83 S.Ct. at 276, the Supreme Court held the question of the applicability of the Full Faith and Credit Clause to child custody decrees has been previously reserved; that the question would not be reached in *Ford* and that if the Full Faith and Credit Clause were applicable to a custody decree it would only require the state to recognize the sister state's

13. Section 13 provides:
Binding force and res judicata effect of custody decree. A custody decree rendered by a court of this State which had jurisdiction under section 4 binds all parties who have been served in this State or notified in accordance with section 6 or who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard. As to these parties the custody decree is conclusive as to all issues of law and fact decided and as to the custody determination made unless and until that determination is modified pursuant to law including the provisions of this act.

order as binding if the sister state would be bound by it. In *Ford*, 371 U.S. at 194, 83 S.Ct. at 277, the Court held that "the courts of South Carolina were not precluded by the Full Faith and Credit Clause from determining the best interest of [the] children." In the *Ford* case, as well as in *Kovacs v. Brewer*, 356 U.S. 604, 78 S.Ct. 963, 2 L.Ed.2d 1008 (1958); *May v. Anderson*, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); and *New York ex rel. Halvey v. Halvey*, 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133 (1947), a state court's right to modify child custody decrees remains undisturbed.

From the foregoing discussion, it is apparent that the lower court met the prerequisites of both subsection 15(a)(1) and subsection 15(a)(2). We have already concluded that the lower court had jurisdiction under section 4(a)(1)(i) and that the Danish Court had lost jurisdiction by not acting within the six–month time frame set forth in section 4(a)(1)(i). Moreover, since we have further concluded that the constraints of section 9 are not here applicable, subsection (b) of section 15 is satisfied.

Lastly, we must consider the significance to be given to the final clause of section 15(b), "it shall give due consideration to the transcript of the record and other instruments of all previous proceedings submitted to it..." When the habeas corpus petition was placed before the lower court with the appellee's request for enforcement of the Danish custody decree, that court was required to make its own judgment of the propriety of that award before acting upon a request to use its powers to enforce it. This would have been the responsibility if the decree had been entered originally by a court of that county or a court of another county of this Commonwealth. As seen in *Ford, supra*, the impact of the Full Faith and Credit Clause does not alter that obligation.

So it appears that the law in Pennsylvania is clear that full faith and credit must be given to the decree of custody of a sister state so far as it determines the status of the child at the time it was issued, but, if the Pennsylvania Court has jurisdiction it may, because of the interest of the Commonwealth in the child, and because the wel-

fare of the child is a paramount consideration, and because decrees of the custody are temporary in nature and subject to modification by changing conditions, determine custody on the present facts and may even exercise its independent judgment on the same facts that determined the foreign state's order. *Com. ex rel. Schofield v. Schofield*, 173 Pa.Super. 631, 98 A.2d 437 (1953); *Com. ex rel. Graham v. Graham*, 367 Pa. 553, 80 A.2d 829 (1951); *Com. ex rel. v. Daven*, 298 Pa. 416, 148 A. 524 (1930); *Com. ex rel. Scholtes v. Scholtes*, 187 Pa.Super. 22, 142 A.2d 345 (1958); *Com. ex rel. Gregory v. Gregory*, 188 Pa.Super. 350, 146 A.2d 624 (1958); *Com. ex rel. Swigart v. Swigart*, 193 Pa.Super. 174, 163 A.2d 716 (1960).

*Irizarry Appeal*, 195 Pa.Super. 104, 108, 169 A.2d 307, 309, cert. denied, 368 U.S. 928, 82 S.Ct. 363, 7 L.Ed.2d 191 (1961).

We do not interpret the final clause of Section 15(b) as usurping the hearing court's right to exercise its independent judgment on the same facts that determined the foreign order. Such a construction would require a jurisdiction to give greater deference to a foreign award than would be allowed under its laws to its own pronouncements in this area.[14] We know of no rule of conflicts which would require such a result. For such a result would lose sight of the cardinal precept in the custody area, to wit: the best interest of the child. Clearly, the legislature only intended these words to assure that the second court would consider those facts which were found to be persuasive by the original court.

## III

When the Common Pleas Court of Greene County heard testimony in the nature of a defense presented by the

---

**14.** The Commonwealth Child Custody Act, *supra*, at § 2415(b) has a like provision:

> If a court of this Commonwealth is authorized under subsection (a) to modify a custody decree of another court it shall give due consideration to the transcript of the records and other documents of all previous proceedings submitted to it in accordance with section 23.

father, the following facts pertinent to the best interest of Thomas, Jr. and Kirstine were uncontroverted:

(1) The mother of these children was sexually assaulted by her father on several occasions between the age of four and twelve years. (R 208a).

(2) The maternal grandfather had taken Thomas, Jr. into the bathroom with him and encouraged the child to hold part of his genitals (R 138a, 232a, 233a, 236a).

(3) Thomas, Jr. informed the court his mother sleeps with a man from the air force, "KLM", another police "guy", plus his father. (R 236a).

(4) The paternal grandfather patted Kirstine's buttocks with her skirt up on one occasion (R 139a) and on another occasion stated, in reference to Kirstine, "I can see by the way she is cuddling on your shoulder, she will be good in bed in about eleven (11) or twelve (12) years." (R 140a).

(5) The mother went on a week–end trip to Lagoland (a Danish Disneyland) with the children and her father. Although the mother and children were in a room separate from the father, he was across the hall.

(6) The mother admitted she was concerned about the children's safety because of what happened to her as a child. (R 210a).

(7) Upon arrival in the United States, the children were unmanageable and uncontrollable (R 141a).

(8) On several occasions the children attempted to fondle the genital areas of their paternal grandparents (R 178a, 179a and 197a).

(9) Kirstine attempted to fondle the breast area of her aunt Bonita Lawrence (R 197a).

(10) Kirstine wanted to watch her grandmother bathe and undress and would cry because she was not permitted to do so. (R 180a).

(11) Thomas, Jr. greeted his aunt with "open–mouth" kissing (R 196a).

(12) The mother's expert, Donald Perkins, senior therapist at Centerville Clinic, testified that the above behavior is not normal in children and is learned (R 224a, 225a).

(13) After a period of eight months in the parental household, the abnormal sexual behavior ceased and the children became disciplined (R 144a, 180a).

Environmental instability and its accompanying emotional discontinuity, primarily sought to be prevented by the Act are one tandem in the numerous possible perils of childhood. Recognizing this, the Legislature retains "the best interest of the child" in section 9(b) as the paramount concern, exceeding the opprobious child snatching, thus allowing for modification when such malodorous acts of moral corruption through the introduction of abnormal sexual activities to small children, as in this case, occur. Such moral corruption is a peril of childhood of a magnitude equal to, if not surpassing, the tandem of environmental instability and emotional discontinuity. To hold otherwise would be to nullify the opening clause of the first sentence in section 9(b) of the Act. Thus even if we were to accept the majority view as to the applicability of 9(b), the record is more than ample to support the exercise of jurisdiction. The Superior Court was not free to nullify the factfinding function of the hearing judge. *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977) quoting Judge Price of the Superior Court in *Spriggs* at 229 Pa.Super. 19–20, 323 A.2d at 277–78. *See also, Commonwealth ex rel. Rainford v. Cirillo,* 222 Pa.Super. 591, 597–98, 296 A.2d 838, 841 (1972).

I must conclude that since the record supported the father's claim, the only rational explanation for the Superior Court's result was an implicit resurrection of the eviscerated tender years doctrine. In *Spriggs, supra,* 470 Pa. at 299, 398 A.2d 635, we said:

Finally, we note that in reaching its conclusion that custody should be awarded to the mother, the majority in the Superior Court relied heavily upon the "tender years

doctrine" and the rule of preference to a resident guardian over a non–resident guardian. The latter principle was obviously more tenable in the days of a less mobile society. In today's accessible and communicative world the validity of this proposition is open to serious question. It would be presumptive to believe that the care and concern of the Pennsylvania Courts for the best interest and the welfare of a child is not shared by our sister States. To the contrary, the thoroughness and the interest exhibited in this case by the Florida Court demonstrates the fallacy of this argument.

We also question the legitimacy of a doctrine that is predicated upon traditional or sterotypic roles of men and women in a marital union. Whether the tender years doctrine is employed to create a presumption which requires the male parent to overcome its effect by presenting compelling contrary evidence of a particular nature; *Commonwealth ex rel. Lucas v. Kreischer*, 450 Pa. 352, 299 A.2d 243 (1973); *Commonwealth ex rel. Logue v. Logue*, 194 Pa.Super. 210, 166 A.2d 60 (1960), or merely as a makeshift where the scales are relatively balanced; *Commonwealth ex rel. Parikh v. Parikh*, 449 Pa. 105, 296 A.2d 625 (1972); *Commonwealth ex rel. Veihdeffer v. Veihdeffer*, 235 Pa.Super. 447, 344 A.2d 613 (1975), such a view is offensive to the concept of the equality of the sexes which we have embraced as a constitutional principle within this jurisdiction. *See* Pa.Const., art. I, § 28; *Conway v. Dana*, 456 Pa. 536, 318 A.2d 324 (1974). Courts should be wary of deciding matters as sensitive as questions of custody by the invocation of "presumptions." Instead, we believe that our courts should inquire into the circumstances and relationships of all the parties involved and reach a determination based solely upon the facts of the case then before the Court.

Accordingly, the order of the Superior Court reversing the decree of the Court of Common Pleas of Greene County should be reversed and the decree reinstated.

FLAHERTY and KAUFFMAN, JJ., join in this opinion.