439 A.2d 1203

**Janie V. WARMAN, Appellant at No. 1069,**

v.

**Philip T. WARMAN.**

**Philip T. WARMAN, Appellant at No. 1120,**

v.

**Janie WALSH, Appellant at No. 1143.**

Superior Court of Pennsylvania.

Argued Sept. 30, 1981.

Filed Jan. 8, 1982.

288

William Radcliffe, Uniontown, for appellant (at Nos. 1069 & 1143) and for appellee (at No. 1120).

Ralph Warman, Uniontown, for appellant (at No. 1120) and for appellee (at Nos. 1069 & 1143).

Before CAVANAUGH, MONTEMURO and VAN der VOORT, JJ.

MONTEMURO, Judge:

This child custody action was initiated by a Pennsylvania-resident father for custody of Philip, a nine-year-old son, whose primary residence has been with his California-resident mother since 1975.

The court below found that the exercise of jurisdiction in Pennsylvania would be improper, and it sustained respondent-mother's (the appellee herein) objection to jurisdiction and dismissed petitioner-father's (the appellant herein) *habeas corpus* petition. We affirm.

## HISTORY OF THE CASE

The parents in this action were divorced in 1972. In a Separation Agreement executed by the parties in connection with that divorce, custody of the child was dealt with at length in the following manner:

9. Should the wife secure an absolute divorce, the custody of the issue of the parties, Philip, born November 14, 1970, is hereby given to wife except as hereinafter provided, and wife will maintain, educate, and support the said child out of the allowance hereinafter provided therefore.

10. Upon the removal of wife from the household of husband with the custody of the child, Philip, husband will pay to wife for the care, maintenance, education and support of said child, the sum of forty (40) dollars per week payable weekly in advance. In addition, husband will maintain Blue Cross, Blue Shield, and major medical insurance coverage upon said child. The obligations set forth in this paragraph will terminate on the death of husband.

. . . . .

11. During the portions of the months of June, July and August not encompassed by the regular school year husband will have the custody, charge and care of the child, Philip . . .

12. The child, Philip, shall have the right to decide free of influence or persuasion by either of the parties hereto, the parent with whom he desires to reside after attaining the age of fourteen years, and on such decision the parent whom the child shall select shall thereupon have the right to the custody, care and charge of such child.

13. Should wife at any time relinquish to husband the custody rights set forth in paragraph nine above, whether such relinquishment is made pursuant to paragraph twelve or for any other reason, wife will have the rights now secured to husband in paragraph eleven.

14. This Agreement shall be construed under the laws of the Commonwealth of Pennsylvania.

In 1975, the mother and son moved to California. Visitation to the father was liberal. Philip ordinarily left California the day after school ended and returned the day before the new fall term started. Additionally, Philip spent a number of holidays such as Christmas and Easter with his father.[1] The child spent increasing amounts of time with his father over the years—nine weeks in 1977, twelve weeks in 1978 and sixteen weeks in 1979.

On May 15, 1980, the mother, in the California court, filed for reduction of the visitation previously agreed upon. She alleged that it would be in the best interests of the child to change the approximately three months summer visitation with the father to a single month, so as to allow the child to continue activities in his home area.

The Superior Court of California, County of Sonoma, at a hearing on June 6, 1980, at which both parents were represented in oral argument by counsel, ordered a modification of visitation. This order reduced the summer vacation visitation from three months to two months and set a date for Philip's return to California for August 15, 1980.

---

1. At one period when Philip's school year was scheduled in an unusual manner, the vacation schedules were adjusted without apparent difficulty by his parents (R. 64a).

On August 11, 1980, the father filed this custody proceeding in the Pennsylvania court. On the same date his lawyer wrote to the mother and informed her that the child would not be returned to California.

On August 15, 1980, the mother filed contempt proceedings in the California jurisdiction for the father's failure to return the child, pursuant to the June 6, 1980, California order. A hearing was held on August 27, 1980, in California, again with legal representation for both parents, and the California court ordered the child returned forthwith.

The mother flew to Pennsylvania immediately. The order of the California court was filed in Pennsylvania on August 28, 1980, the same day that the father filed a Petition to Strike or Open the California decree.

On the same date, accompanied by a Constable and having in her possession a copy of the California order, the mother picked up the child at school and returned to California.

A full hearing on custody was scheduled by the Pennsylvania court, but by order of September 9, 1980, a hearing was granted solely for the purpose of determining jurisdiction on the date of September 15, 1980. By order of October 30, 1980, the Pennsylvania court held that proper exercise of jurisdiction lay with the California court, and the father's action in this Commonwealth was dismissed. Father appealed.

## ANALYSIS OF THE LAW

### History of the Present Act

The present Pennsylvania statutory structure created to deal with problems of child custody consisted originally of two separate acts. The Uniform Child Custody Jurisdiction Act, June 30, 1977, P.L. 29, No. 20, Sec. 1, eff. July 1, 1977, 11 P.S. Sec. 2301–2325, was designed to provide measures for dealing with inter-state and international custody problems. The Commonwealth Child Custody Jurisdiction Act, April 28, 1978, P.L. 108, No. 47, eff. June 28, 1978, 11 P.S. Sec. 2401–2424, was by contrast, designed to handle child custody

problems intra-state. The two acts have since been consolidated in Title 42 Pa.C.S.A. Sec. 5341–5366, 1980, Oct. 5, P.L. 693, No. 142, Sec. 201(a).

Much of the Pennsylvania Act follows the Uniform Law approved by the National Conference of Commissioners on Uniform State Laws and the American Bar Association in 1968. Some thirty-eight states have adopted the law; however, it is not a "reciprocal" law and is in full operation in each state regardless of its enactment in other states. See Comment of Commissioners, 9 *Uniform Laws Annotated*, p. 114, West Publishing Co. 1979.

## Construction and Purposes of the Act

The Act has three major bases for jurisdiction which can be briefly mentioned here before further analysis: Section 5344(a)(1) provides for "home state" jurisdiction; Sec. 5344(a)(2) provides for jurisdiction based on "significant contacts" among the various parties to the custody action and the locale in which the action has been brought; Sec. 5344(a)(3) provides for *"parens patriae"* jurisdiction for emergency situations in which a child is abandoned, abused or dependent.

It is easy to see that the existence of three quite different bases for jurisdiction, in an area of the law with the emotional impact of child custody, could prove to be a constant source of false hope to non-custodial parents. A loving parent has little problem in convincing himself or herself that the established custody is harmful, and that however evil disruption of children's lives may be *in general*, that *this* case presents the exception, and that only good can result from snatching or retaining the child, or from persuading a new jurisdiction to accept a Petition for Custody.

Added to the parental viewpoint of the righteousness of a unilateral move to improve the child's life, are the further puzzles of interpreting the child's reaction to pressure by the two most important people in his world. Few children want to displease either parent, and the considerations that sway their election are often matters of little lifetime value. The

five-year-old may choose the parent who gives presents; the eight-year-old may agree alternately with whichever parent is currently applying pressure; the thirteen-year-old may project the miseries endemic to that age on the parent he lives with and prefer an as-yet-unknown existence in the other parental home.

A parent's earnest desire for his or her child and the child's expressed wishes are, of course, factors, *once the matter of jurisdiction has been settled.* Too often, however, a parent is moved by his own desires and the obliging agreement of the child and simply takes the law into his or her own hands. The present scheme of the law has been carefully crafted in the hope of bringing order to a situation that has been chaotic in the past. Every effort has been made to implement an interlocking system which will avoid jurisdictional overlaps, assure fair results, and prevent undue disruption of young lives.

The general purposes of the act are strongly stated in Section 5342(a)(1)–(8). The list contains overlaps, and the important features boil down to a conviction that *the instability that results from child-snatching and forum-shopping is harmful to children, and that the court system should not condone the unilateral decision of one parent in helping himself or herself by attaining the physical possession of the child and seeking the forum most likely to award permanent custody to that parent.*

Section 5349, entitled "Jurisdiction Declined by Reason of Conduct" fleshes out the prohibitions against parental self-help.

(a) General Rule.—If the petitioner for an *initial* decree has *wrongfully taken* the child from another state or *has engaged in conduct intending to benefit his position* in a custody hearing, the court *may decline* to exercise jurisdiction if this is just and proper under the circumstances.

(b) Restriction on modification of a foreign decree.—Unless required in the interest of the child, the court *shall not exercise its jurisdiction to modify a custody decree*

*of another state* if the petitioner, without consent of the person entitled to custody, *has improperly removed the child* from the physical custody of the person entitled to custody or has *improperly retained the child* after a visit or other temporary relinquishment of physical custody. If the petitioner has *violated any other provision of a custody decree* of another state *the court may decline* to exercise its jurisdiction *unless* the petitioner can show that conditions in the custodial household are *physically or emotionally harmful* to the child, *the burden of proof being on the petitioner* requesting the court to take jurisdiction.

(c) Costs and expenses.—Subject to general rules, in appropriate cases a court dismissing a petition under this section may charge the petitioner with necessary travel and other expenses, including attorney's fees, incurred by other parties or their witnesses. (Emphasis Supplied)

■ There is a distinction made between the situation in which there is as yet *no* court decree and one in which a *foreign* decree exists: wrongful conduct in the first instance gives the court the right to decline jurisdiction "if just and proper"; in the latter situation the language is mandatory, and the court *shall* not exercise its jurisdiction. There is always however, the caveat that provides for overriding these considerations when the child is suffering physical or emotional harm.

Section 5343 is definitional and sets forth in pertinent part the following wording:

"Contestant." An institution or an individual, including a parent, who claims a right to custody or visitation rights with respect to a child.

"Custody determination." A court decision and court orders and instructions providing for the custody of a child, including visitation rights; the term does not include a decision relating to child support or any other monetary obligation of any person.

"Custody proceeding." Includes proceedings in which a custody determination is one of several issues, such as an action for divorce or separation, and includes child neglect and dependency proceedings.

"Decree" or "custody decree." A custody determination contained in a judicial decree or order made in a custody proceeding, and includes an initial decree and a modification decree.

"Initial decree." The first custody decree concerning a particular child.

"Modification decree." A custody decree which modifies or replaces a prior decree, whether made by the court which rendered the prior decree or by another court.

"Physical custody." Actual possession and control of a child.

Close examination of these definitions in relation to each other sheds light on the other sections of the Act.

A parent claiming custody rights *or* visitation rights is equally a "contestant." We may infer, therefore, that visitation, equally with custody-proper, presents a "contest" which may be settled in a court proceeding.

A "custody determination" is specifically related to court action which produces a "decision" and "orders and instructions." No ranking is made among these writings; again, we must infer that whatever the determination is labeled, it is to be accorded weight under the Act.

Definition of the phrase "custody proceeding" is oddly worded, and appears to address itself only to such court actions as might be doubtful of definition, as where custody is covered in one clause of a divorce decree, or where the paramount issue handled by the court was parental unfitness and a finding of dependency. The presupposition, of course, is that any hearing *solely* concerned with the physical possession and control of a child is so obviously a "custody proceeding" as not to need clarification.

The Act is not artfully drafted in the definitional section, but there is recognition of the fact that a court may

combine or separate custodial matters in an almost infinite variety of ways. The intent is that all determinations covering the issue of the actual physical possession and control of a child *are* to be covered by this Act, whether they are linked to other matters in a single document or whether they stand alone. Other determinations, though closely associated with physical possession and control of a child, are not covered.

■ The term "initial decree", therefore, can be an initial decree as to primary custody, an initial decree as to visitation, or, presumably, an initial decree as to dependency and the amount of custodial control appropriate to remedy parental neglect or ignorance. It may, of course, treat several of these subjects at once and be an "initial decree" as to all of them.

The "modification decree" is an order "modifying or replacing a *prior* decree." We must note, however, that a decree can only "modify or replace" a prior decree concerning identical issues.

Thus, an initial finding of dependency, for instance, might be later in time than a divorce decree placing custody in one parent. Insofar as the later determination addressed the problem of physical possession of the child, it would be a "modification" of the initial decree; it would still be an "initial" finding of dependency. Similarly, if the first court decree addresses only the issue of visitation, it is an "initial decree" as to visitation, but cannot be said to "modify" a primary custody that has never been reduced to determination by a court.

As long as any of these determinations are exercised by a jurisdiction "substantially in conformity with this subchapter," they are to be respected by the litigants and by our courts.

The three jurisdictional bases mentioned previously form the essential pattern of the act. Closer examination of Sec. 5344 is therefore necessary for any solution of a jurisdictional problem, and we will examine its provisions.

*"Home State" Jurisdiction*

The typical custody case starts in the separation of parents and the concomitant need to establish a home for the children of the marriage with one or the other of the natural parents. It is understandably rare for parents to seek a custody decree before separation, and where children reside together with both parents, the custody is equally established in both. In the normal progress of separation, one of two outcomes is usual: one parent leaves the marital home alone, in which case initial custody falls upon the parent who stays in the home; otherwise, the parent who departs from the home takes the children with him or her to a new residence, often a new jurisdiction, and assumes their custody.

The Act, therefore, places jurisdiction initially in the "home state" or "home county", under Sec. 5344(a)(1) *regardless of the actual physical whereabouts of the children.*

(a) General Rule—A court of this Commonwealth which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) This Commonwealth:

(i) *is the home state* of the child at the time of commencement of the proceeding: or

(ii) *had been the home state of the child within six months before commencement* of the proceeding and the child is absent from this Commonwealth because of his removal or retention by a person claiming his custody ... and a parent ... continues to live in this Commonwealth.

"Home state" is defined in Sec. 5343 of the Act as "the state in which the child *immediately preceding* the time involved lived with his parents ... for *at least six consecutive months* ..."

The interaction of these two provisions results in the logical determination that neither parent can be "at fault" in initially taking or relinquishing custody of the

child, even without court order. However, certain elements do become fixed: *custody* is in the parent with physical possession of the child; yet primary *jurisdiction* remains in the community the child recognizes as "home."

This court has already confirmed the interlocking of these provisions in the case of *In the Matter of D.L.S. and J.L.S., Appeal of K.A.S.*, 278 Pa.Super. 446, 420 A.2d 625 (1980). There, the mother took two children from their prior residence in Pennsylvania to Florida upon separation from their father. She claimed to have started a custody action in that state. The father filed an action in Pennsylvania only three weeks after the children were removed from the marital home; the lower court dismissed the mother's preliminary objections to jurisdiction, and this court affirmed.

The Court emphatically found jurisdiction in Pennsylvania as the "home state" under the Act and also concluded that Florida could *not* exercise jurisdiction:

> In light of the very brief presence in Florida of the children and one of the contestants—a mere three and one-half weeks—and the lack of any prior connections there, it is difficult to understand how a Florida court could properly exercise jurisdiction under the criteria of the Uniform Child Custody Jurisdiction Act. Id., 278 Pa.Super. 451, 420 A.2d at 627.

Once the initial period has run, however, the "home state" becomes the place in which the child has lived with the custodial parent "before commencement of the proceeding." See *supra*. Sec. 5344(a)(1)(ii).

Comments by the commissioners who drafted the Uniform Act confirm this view:

> The main objective [of the wording identical with Sec. 5344(a)(1)(ii) ] is to protect a parent who has been left by his spouse taking the child along. The provision makes clear that the stay-at-home parent, *if he acts promptly*, may start proceedings in his new state if he desires, *without the necessity of attempting to base jurisdiction on paragraph (2)* [The equivalent of Sec. 5344(a)(2)—the "Sig-

nificant Contacts" provision discussed *infra* ]. 9 *Uniform Laws Annotated* at 123 (Emphasis Supplied)

It is important to note that the Commissioners clearly give *preference* to "home state" jurisdiction; they acknowledge that in some instances "necessity" will make a contestant "attempt" to establish significant contacts as a base. This, however, is the *alternative* means.

### "Significant Contacts" Jurisdiction

How then, do the provisions interact where the parent with initial custody moves back to a former, well-known community where the children already have formed "significant contacts"? A common variant of this pattern is the problem of the child who returns to visit the non-custodial parent in familiar surroundings after some months or years of primary custody elsewhere and is retained when the official visiting time ends. Still another variant is the outright child-snatch by a parent who returns a child to familiar surroundings. The latter two examples are further complicated by conduct on the part of non-custodial parent which may easily be "wrongful" under the act at Sec. 5349(a) or (b). See provisions set forth, *supra.*

The wording of Sec. 5344(a)(2) is essentially identical to that of the suggested wording in the Uniform Act, providing for jurisdiction when:

(2)(i) the child and his parents, or the child and at least one contestant, have a significant connection with this Commonwealth; and

(ii) there is available in this Commonwealth substantial evidence concerning the present or future care, protection, training, and personal relationships of the child.

Again, the comments by the drafters of the Uniform Act are enlightening:

Paragraph (2) perhaps more than any other provision of the Act *requires that it be interpreted in the spirit of the legislative purposes* expressed in Section 1. [Equivalent

to 42 Pa.C.S.A. 5342 (a)(1)–(8) ] The paragraph was phrased in general terms in order to be flexible enough to cover many fact situations too diverse to lend themselves to exact description. *But its purpose is to limit jurisdiction rather than proliferate it. Uniform Annotated Laws, supra* at 124. (Emphasis supplied).

The Commissioners suggest as an example that the return of one parent and the children with consent of the other parent to a community which was formerly and recently the marital home might be grounds for Sec. 5344(a)(2) jurisdiction.

### *Parens Patriae Jurisdiction*

The third source of jurisdiction, the *parens patriae* or "emergency" provision, is not applicable to the instant case, and we will not elaborate upon it at present. It is found at Sec. 5344(a)(3) of the Pennsylvania Act.

As to the group of three jurisdictional bases, the Commissioners' comments also state:

This section [equivalent to Sec. 5344(a)(1)–(3) ] governs jurisdiction to make an *initial* decree as well as a *modification* decree. . . .Jurisdiction to modify an initial or modification decree of another state is subject to additional restrictions contained in Sections [5349] and [5355]. *Id.* at 125. (emphasis supplied).

Most importantly, the Commissioners state emphatically that:

While jurisdiction may exist in two states in these instances, it will not be *exercised* in both states. *Id.* at 124 (emphasis on original).

■ It is clear that both child-snatching *and* retention of a child after a legitimate visit and, indeed, "any" conduct a parent engages in which is intended "to benefit his position" in a custody hearing gives the court a legitimate reason to refuse to exercise possible jurisdiction where another forum

is the "home" forum. This is true whether an "initial" decree exists or not.

The burden is on the petitioner who wants jurisdiction in a forum other than the "home"; the only justifications for a court's assumption of the possible, but less favored, jurisdictions under the "significant contacts" or "emergency" provisions are justice and propriety under Sec. 5349(a) and physical or emotional harm under Sec. 5349(b). In light of the stated purposes of the Act, the Commissioners' Comments, and prior case law, such as *In the Matter of D.L.S. and J.L.S., Appeal of K.A.S.*, 278 Pa. Super. 446, 420 A.2d 625 (1980) and *Zaubi v. Zaubi*, 275 Pa. Super. 294, 418 A.2d 729 (1978) aff'd 492 Pa. 183, 423 A.2d 333 (1980), the burden on the petitioner who wishes to establish an alternative jurisdiction is very heavy indeed—especially if he or she approaches the matter with unclean hands.

### Discussion of Law and Facts

The parties to this action are the typical contestants, the parents of the child. There is no question here of emergency jurisdiction; this is a well-adjusted, loved child who obviously thrives in both his Pennsylvania and California environments.

Originally, custody of this child was determined by written agreement of the parties to be with the mother, with liberal visitation for the father. Thus, at the time that the father decided to retain the child and to file for a custody determination in this Commonwealth, there was no "initial" determination outstanding as to that issue.

There was, however, an outstanding initial order of the California court changing the privately-agreed *visitation* schedule, and this interesting subsidiary problem deserves discussion. As seen above, a court's "orders and instructions" as to visitation are a form of custody determination and are to be guided by the provisions of this Act.

■ However, where the only court decree extant is concerned purely with change of a privately-agreed *visitation* schedule, and where that determination has been made on brief oral argument of counsel, we must limit its application to its own terms. Such a decision by a court cannot be the means of establishing, as if on a decisional basis following full hearing on the best interests of the child, anything pertaining to primary custody. This would be permitting the tail to wag the dog.

As to the effect of the existence of such a decree on the issue of jurisdiction for custodial matters, we agree with the lower court that such an order, when issued by another court with a legitimate claim to jurisdiction, *must be obeyed by the contestants.* Even if the issue decided is a limited one, the obligation to adhere to those limits is clear.

■ In the interest of promoting the purposes of the Act, we would suggest that *compliance* with an order of another jurisdiction should not be permitted to prejudice the aggrieved parent's future legal action in his or her preferred jurisdiction, even though *non*-compliance does have an effect under the terms of the Act. See Sec. 5349 set forth *supra.*

The stated purposes of the Act obviously are advanced by orderly procedure, and it is equally obvious that if a parent is held to be conceding jurisdiction by obeying *any* order of a foreign court, that parent will be tempted to defiance rather than compliance, to the detriment of the child.

In the instant case, a child accustomed to the orderly transfer to the custodial parent was subjected to just the disturbing events the Act is intended to curtail: school in a new place, the sudden appearance of the custodial parent with a foreign court order, departure from the Commonwealth without luggage or a chance to say farewells, and re-commencement of the school year in another state. And this does not begin to explore the pressure put on a nine-year-old to express a preference or to have to account for that preference.

■ The order of the court below in this instance took note of the existence of the California visitation determination, but did not permit the existence of an initial visitation decree to usurp its own right to consider its own jurisdiction as to primary custody of Philip. We agree that this was a proper weighing of the issue. The Pennsylvania court was free to consider its own powers *apropos* primary custody and a determination of the best interests of the child under the circumstances of a valid, established private custody agreement between parents, rather than as a court facing a simultaneous or prior court action of another jurisdiction.

■ A custody agreed upon by parents is, of course, never a final determination. *Com. ex rel Veihdeffer v. Veihdeffer*, 235 Pa.Super. 447, 344 A.2d 613 (1975). A child cannot be a piece of property to be disposed of in a Separation Agreement, *In re Rosenthal v. Rosenthal*, 103 Pa.Super. 27, 157 A. 342 (1931) although the courts do encourage sensible private solutions to custodial problems where possible.

Nevertheless, where a child has been in custody of one parent under favorable conditions, our case law indicates that a court should be reluctant to disturb the successful arrangement. *Commonwealth ex rel Foster v. Foster*, 225 Pa.Super. 436, 311 A.2d 663 (1973); *Commonwealth ex rel Swanson v. Barry*, 199 Pa.Super. 244, 184 A.2d 370 (1962).

As seen *supra*, the scheme of the present custody statute also strongly supports the *status quo*. This is one reason why the "home" jurisdiction is favored.[2] Continuity of a reasonable and functional custody arrangement has proven value for a child's growth; the fond hopes of the non-custodial parent that his or her home will supply an enriched environment do *not* have proven value.

**2.** As noted above, the "home" jurisdiction not only keeps children in familiar circumstances, it also gives a parent who does not originally concede custody to a departing spouse, a grace period to redress the situation.

■ The five years that Philip has spent in California in the primary custody of his mother unmistakably make California the appropriate forum for custody actions concerning this child.

The lower court quite properly found that the child had connections with both Pennsylvania and California and that "substantial evidence concerning his present or future care, protection, training, and personal relationships" could be found in both.

Having done that, the court below exercised just such judicial restraint as the Commissioners' Comments envisioned when they stated that jurisdiction might "exist in two states but would not be *exercised* in both," and that the purpose of Sec. 5344(a)(2) was to "limit jurisdiction rather than proliferate it." *See* citations, *supra.*

The trial judge, having come to his decision to decline jurisdiction in Pennsylvania on an analysis of the wording of Sec. 5344 did not thereafter consider the wording of Sec. 5349; this was a matter within his discretion. This opinion, however, has discussed the prohibitions against parental self-help because they form an essential feature of the Act, even though the decision in this particular case may be, and has been, made on other grounds. It is important that future litigants should be aware that wrongful conduct "intending to benefit" a parent's position in a custody battle may well be made a factor in the balance of the court determination.

## CONCLUSION

The lower court has properly analyzed and applied the jurisdictional provisions of the Uniform Child Custody Jurisdiction Act, and the decision to decline jurisdiction in this Commonwealth is hereby affirmed.

CAVANAUGH and VAN der VOORT, JJ., concur in the result.